534 A.2d 798

**Robert W. DORN**

v.

**STANHOPE STEEL, INC., Cambridge Industries, Inc. and L.B. Foster Company.**

**Appeal of STANHOPE STEEL, INC. and Cambridge Industries, Inc.**

Superior Court of Pennsylvania.

Argued Sept. 11, 1986.

Filed Nov. 4, 1987.

Reargument Denied Jan. 5, 1988.

560

562

James P. Hollihan, Pittsburgh, for appellants.

James R. Cooney, Pittsburgh, for appellees.

Before BROSKY, ROWLEY and POPOVICH, JJ.

ROWLEY, Judge:

Stanhope Steel, Inc. (Stanhope) and Cambridge Industries, Inc. (Cambridge) appeal from the judgment entered against them in the amount of $127,698.76 in favor of appellee, Robert W. Dorn, following the denial of appellants' motions seeking post-trial relief in this action for breach of a written exclusive brokerage agreement. Three issues are raised on appeal: (1) Were obligations which Stanhope had under its brokerage contract with its agent, Dorn, extinguished as a matter of law when Stanhope voluntarily discontinued business? (2) Was the continued existence and operation of Stanhope an implied condition of the brokerage contract when the contract contained specific provisions for termination, and such provisions did not address the continued existence and operation of the corporation? (3) Is Stanhope entitled to a new trial to establish that it is excused from performing under the contract because of supervening impracticability and supervening frustration. We affirm.

■ The case had its genesis in a written agreement entered into between appellee and Stanhope on October 1, 1979 and a written five year extension of the agreement executed on May 1, 1981. Throughout the 1960's and 1970's, prior to execution of the agreement at issue here,

appellee sold and leased steel pilings for R.C. Stanhope, Inc. In 1979, R.C. Stanhope, Inc. was purchased by Cambridge, a holding company. Thereafter, R.C. Stanhope, Inc.'s name was changed to Stanhope Steel, Inc. and was operated as a subsidiary of Cambridge. Shortly thereafter, Stanhope and appellee executed a written brokerage agreement.[1] The agreement defined appellee's role as Stanhope's "sole and exclusive broker in the rental and sale of steel sheet piling and H-bearing piles" in certain regions and as a "broker and independent contractor engaged in promoting and selling various lines...." The agreement was for a term of three years and contained the following provision for termination before the term of three years expired:

[T]his exclusive Broker's Agreement may be terminated at any time, at the option of Stanhope Steel, Inc. (1) in the event of your death or disability, (2) if for any reason beyond your control you are prevented from fully carrying out all of the provisions of this Broker's Agreement, or (3) if for other reasons it is deemed advisable to the best interest of all parties concerned. Notice of any such termination, at the option of Stanhope Steel, Inc., as aforesaid, shall be given in writing at least six months ... before such termination.

1. The original record, as certified to us, does not contain the exhibits admitted at trial. Although appellants have included the exhibits as part of their reproduced record, a paper may not be made part of the record simply by reproducing it. *Pittsburgh's Airport Motel v. Airport Asphalt and Excavating Co.*, 322 Pa.Super. 149, 469 A.2d 226 (1983). The only place in the original record where any of the papers admitted at trial appear, are as "exhibits" to appellants' brief in support of post-trial relief. The "exhibits" are copies of the agreement at issue, dated October 1, 1979, and the five year extension of the October 1 agreement, dated May 1, 1981. Because the brief in support of post-trial motions and the attached "exhibits" were filed in the trial court, they constitute part of the original record. Pa.R.A.P. 1921; *Commonwealth v. Rini*, 285 Pa.Super. 475, 427 A.2d 1385 (1981). However, we must limit our review to those matters testified to at trial and the two "exhibits" which appear in the original record. We do not consider those exhibits which appear in the reproduced record, but not in the original record. *See Commonwealth v. Williams*, 357 Pa.Super. 462, 466, 516 A.2d 352, 354 (1986) ("It is the appellant's responsibility to provide a complete and comprehensive record to the reviewing court for the purposes of appeal.")

In 1981, appellee sought and secured a five year extension of the 1979 agreement. The extension took effect on May 1, 1981. In early 1984 Cambridge sold the assets of Stanhope to L.B. Foster Company.[2] On February 7, 1984 appellee was notified in writing that the agreement was terminated.

Appellee filed the present action seeking damages for breach of the exclusive brokerage agreement against Stanhope, Cambridge and L.B. Foster. The case was tried before a jury and the trial court directed a verdict in favor of appellee against Stanhope. The amount of appellee's claimed damages was stipulated subject, however, to appellant's argument that appellee, if entitled to recover at all, was entitled to recover, at the most, six months compensation. The only issues submitted to the jury were the liability of Cambridge and L.B. Foster. The jury returned a verdict in favor of appellee against Cambridge, and in favor of L.B. Foster against appellee. On appeal appellants argue that they are entitled to judgment n.o.v. or, in the alternative, a new trial.

## I. Judgment N.O.V.

■ Appellants present four arguments in support of their contention that they are entitled to judgment n.o.v., as a matter of law, based on the record before us.[3] Appellee,

2. At oral argument, counsel for appellee agreed that the transaction was a bona fide sale.

3. Appellants raised a fifth argument in their motion for judgment n.o.v. relative to this claim, on the basis that Stanhope was entitled to a ruling, as a matter of law, that it was excused from performance under the doctrines of supervening impracticability and supervening frustration. Appellants present the same claim on appeal. As we noted at the outset, we may only consider the evidence actually admitted at trial in reviewing the trial court's denial of a judgment n.o.v. Because the trial court limited appellants to the presentation of offers of proof on the issue, appellants can only point to the following evidence in support of a judgment n.o.v.: "It is undisputed that, at the time it 'sold its assets to L.B. Foster, Stanhope Steel was losing vast amounts of money and its financial position was such that it could not even pay its normal operating expenses." Appellants' brief at 28. This allegation, by itself, is insufficient to entitle appellants to the entry of a judgment n.o.v. See our discussion in section II. C. of this opinion.

on the other hand, argues that he was entitled to, and properly received, a directed verdict based on the record. For reasons which follow, we reject each of appellants' four claims that they were entitled to judgment n.o.v. on this record.

Our standard of review in considering appellants' argument for judgment n.o.v. is well settled:

> [O]n appeal from the refusal of the lower court to enter judgment n.o.v., the sole duty of the appellate court is to decide whether there was sufficient evidence to sustain the verdict, granting the verdict winner the benefit of every favorable inference reasonably to be drawn from the evidence and rejecting all unfavorable testimony and influences.

*Walasavage v. Marinelli,* 334 Pa.Super. 396, 407, 483 A.2d 509, 514–15 (1984) (citation omitted). In reviewing appellants' arguments relative to their judgment n.o.v. claim, we will consider only the evidence on record. "In determining the sufficiency of the evidence, we consider the evidence actually received, whether the trial rulings thereon were correct or not." *Reichman v. Wallach,* 306 Pa.Super. 177, 185, 452 A.2d 501, 505 (1982) (citations omitted). Additionally, it is crucial to bear in mind the distinction between appellants' claim that they are entitled to judgment n.o.v., and their claim, addressed in Part II. of this opinion, that the trial court erred in directing a verdict in favor of appellee.

## A.

■ Appellants first argue that they are entitled to judgment n.o.v. because any obligations which Stanhope had under the agreement were extinguished when it discontinued business and its assets were sold to L.B. Foster.[4] At

---

**4.** Appellants frame the issue in this manner: "Whether the discontinuance of Stanhope Steel's business in 1984 extinguished its obligations under a brokerage contract existing between Stanhope and Robert Dorn?" Appellants' brief at 2. Thus, appellants appear to contend that the act of corporate dissolution, as a matter of law, relieves them from their contractual duty to their agent.

the outset, we note the general maxim that "a corporation dissolved by its voluntary act remains bound by its outstanding executory contracts." 19 Am.Jur.2d *Corporations* § 2888. In the case before us, the act of selling Stanhope's assets to L.B. Foster was the functional equivalent to corporate dissolution because *all* of the assets were sold and the company went out of business. Thus, the distinction is one without a difference in this case. Professor Williston states in his treatise that where the corporation voluntarily dissolves itself, "a contract, although made impossible of performance, is made so by the act of the corporation, and [the corporation] or its assets are liable for its failure to fulfill its obligation." 18 Williston on Contracts (1978) § 1960; *Martin v. Star Publishing Co.*, 50 Del. 181, 126 A.2d 238, 243 (1956). These concepts are addressed by §§ 1907 and 2111 of the Pennsylvania Business Corporation Law. "The dissolution of a business corporation ... shall not take away or impair any remedy given against such corporation, its directors or shareholders, for any liability incurred prior to such dissolution, if suit thereon is brought and service of process had before or within two years after the date of such dissolution." 15 Pa.S. § 2111(A). As to corporate mergers, "[t]he surviving or new corporation shall thenceforth be responsible for all the liabilities and obligations of each of the corporations so merged or consolidated." 15 Pa.S. § 1907. These statutes and general principles support the view, preferable to that of appellants, that contracts generally survive the discontinuance of business operations.

■■■ Appellants' contention that their obligations were extinguished by reason of discontinued operations and sale of assets must fail unless the agreement falls within the purview of a valid exception. In determining whether the agreement in question falls within a valid exception to the general rule, it is important to distinguish between employment contracts and agency contracts. A corporation's rights and duties regarding its employee or agent vary according to the nature of the relationship. The distinction

becomes crucial when termination is involved. A contract of employment for a definite term cannot be lawfully terminated by an employer prior to the expiration date. *Alpern v. Hurwitz,* 644 F.2d 943 (2d Cir.1981). However, a principal always has the power to revoke agency. *Restatement (Second) of Agency* § 118, comment b. Nevertheless, such power to revoke does not necessarily absolve the principal of liability for breach of the agency contract. Under the Restatement, "[a] principal has a duty not to repudiate or terminate the employment in violation of the contract of employment." *Restatement (Second) of Agency* § 450.

■ There can be no doubt that the relationship between Stanhope and Dorn was one of principal and agent. First, Stanhope referred to the agreement as a "brokerage arrangement," and the agreement states that Dorn is "acting as a broker and independent contractor." As stated in 12 Am.Jur.2d *Brokers* § 30, "[t]he essential and basic feature underlying the relation of a broker to his employer is that of agency, and the principles of law applicable to principal and agent govern their respective rights and liabilities throughout...." Second, the agreement specified that Dorn's duties were to "diligently and aggressively promote the rental, sale, and purchase for Stanhope Steel of [steel sheet piling and H-bearing piles] by diligently calling on customers and prospective customers located in your exclusive territories." This comports with the view that "an agent represents his principal in business dealings and is employed to establish contractual relations between the principal and third persons, while a servant is not." 53 Am.Jur.2d *Master & Servant* § 3. Thus, the terminology given to the agreement, and the duties thereunder, establish that a contract of agency existed between Stanhope and Dorn, and not a contract of employment.

■ "[T]o terminate an agency, there must be either a lapse of time, accomplishment of the anticipated results, external changes in the relationship (e.g., death of parties, changes in business conditions), or mutual consent, revocation, or renunciation." *Scott v. Purcell,* 264 Pa.Super. 354,

399 A.2d 1088, 1093, aff'd 490 Pa. 109, 415 A.2d 56 (1979). The sale of Stanhope's assets undoubtedly constituted an external change in the relationship. Therefore, we hold that the agency agreement between Stanhope and Dorn was terminated by operation of law when Stanhope voluntarily discontinued operations.

■ We now address the question of whether appellants were entitled to judgment n.o.v. in light of the termination. If, as appellants claim, Stanhope's obligations to Dorn were extinguished when the agency agreement was terminated, appellants would be entitled to judgment n.o.v. For reasons which follow, we find that Stanhope remained obligated under the agreement to pay Dorn the agreed upon compensation,[5] notwithstanding our holding that the voluntary dissolution terminated the agency agreement by operation of law. In reaching this conclusion we look to the seminal case of *John L. Rowan & Co. v. Hull,* 55 W.V. 335, 47 S.E. 92 (1904), which has been widely cited for the proposition that although an agency, not coupled with an interest, but of a fixed duration, may be revoked by the principal at will, the principal will be liable to the agent for damages for wrongful revocation within such time. *Geyler v. Dailey,* 70 Ariz. 135, 217 P.2d 583 (1950); *Levander v. Johnson,* 181 Wis. 68, 193 N.W. 970 (1923); *Rucker & Co. v. Glennan,* 130 Va. 511, 107 S.E. 725 (1921); *Cloe v. Rogers,* 31 Okl. 255, 121 P. 201 (1912); *Hancock v. Stacy,* 103 Tex. 219, 125 S.W. 884 (1910); *Novakovich v. Union Trust Co.,* 89 Ark. 412, 117 S.W. 246 (1909).

In *Rowan,* the owner of a farm entered into a written agreement with a real estate agent to list his farm for a period of three months. The agent found a buyer during that time, but the owner decided not to sell and revoked the

---

5. The agreement couches the compensation in the following terms: "It is agreed that while you are the exclusive Broker for the territory contemplated by this agreement you shall have a draw of $4,000/month. This draw shall be the commission payable on sales, rentals and purchases aggregating 4,000 tons annually." The agreement then lists the rate at which the broker's commissions will be paid.

agent's authority to find a buyer. The agent sued to recover his commission under the agreement. The owner/principal contended that he had the power to revoke at any time, notwithstanding the three-month term under the agreement, and that the agent at most was entitled to compensation for his expenses incurred under the power. The Court held that the agent was entitled to his full commission. It reasoned:

> [T]he principal may revoke the authority at any time. But it by no means follows that, though possessing this power, the principal has a right to exercise it without liability, regardless of his contract in the matter. It is entirely consistent with the existence of the power that the principal may agree that for a definite period he will not exercise it, and for the violation of such agreement the principal is as much liable as for the breach of any other contract.

47 S.E. at 93. We agree with the reasoning in *Rowan*, and we adopt the principles set forth by that court. Under the facts of the case at bar, we find no material difference between appellant Stanhope's decision to voluntarily discontinue its business by selling its assets to L.B. Foster, thereby eliminating the purpose of its relationship with appellee, and the owner's exercise of his right to terminate the agency in *Rowan*. The methods of terminating the agent/broker's authority were different, but the agent/broker has been no less wronged in either case, and liability attaches to the same extent, due to the voluntary nature of the principal's conduct in each case. Therefore, we hold that the trial court acted properly in directing that the verdict be entered in favor of the appellee.

 We are cognizant of cases which hold that a principal will not be liable for breach of "output" agreements [6] with an agent, where the principal, in good faith, was forced to

---

6. Under Pennsylvania decisions, "the buyer in a requirements contract has no duty to have any requirements and a seller under an output contract has no duty to have any output." *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corporation*, 130 F.2d 471 (3d Cir.1942).

cease production due to circumstances beyond its control. In *Sheesley v. Bisbee Linseed Co.*, 337 Pa. 197, 10 A.2d 401 (1940), the defendant manufactured edible oils from crushed seeds and sold the meal as a by-product. Plaintiff, a livestock feed dealer with many years of sales experience, entered into an exclusive brokerage contract[7] with defendant, agreeing to aggressively push the sale of Colza Oilmeal in certain specified counties of Pennsylvania and Maryland. Defendant's letter agreement covered "only our production of pure Colza Oilmeal ... and all other products which we produce are specifically exempted from this agreement." *Id.*, 337 Pa. at 200, 10 A.2d at 403. The contract was for a period of one year with an option to extend it to five years. When Congress imposed a two cents per pound tax on import of the seed, defendant determined that the retail price of the meal would be too high for the product to sell. *Id.* Defendant ceased production, and plaintiff brought suit for breach of contract.

The Court found that because the written instrument expressly stated "[t]his agreement covers only our production of pure Colza Oilmeal," it was an output contract. As such, the Court held, there was no implied obligation to keep the plant in operation. *Id.*, 337 Pa. at 202, 10 A.2d at 404. Thus, since the action was taken in "entire good faith and not for the purpose of injuring plaintiff," the Court reasoned, defendant did not violate any of its obligations to plaintiff by ceasing production of the product.

In *Du Boff v. Matam Corp.*, 272 A.D. 502, 71 N.Y.S.2d 134 (1947), plaintiffs were appointed sales agents for "all home appliance products produced" by defendant for a period of five years. Defendant liquidated its business and sold all assets. The Court held that defendant had no obligation to continue in business, since a requirements/output contract was involved. As with *Sheesley*, disposition of

7. The Court found it "unnecessary to decide whether this contract created the relationship of 'vendor and vendee' between plaintiff and defendant, or an 'exclusive sales agency', or 'a grant of the right to sell the particular commodity within the prescribed territory to the exclusion of all others....'" *Sheesley*, 337 Pa. at 202, 10 A.2d at 403.

this case turned on the fact that a requirements/output contract was involved.

The case at bar differs materially from the afore-mentioned cases in that the contract cannot be construed as a requirements or output contract. Dorn contracted to sell "steel sheet piling and H-bearing piles," not *all the steel sheet piling and H-bearing piles Stanhope produces.* Consequently, when Stanhope ceased producing those items by going out of business, the company breached its agreement with Dorn.

### B.

Appellants argue, in the alternative, that they are entitled to judgment n.o.v. because there is an *implied condition* in the brokerage agreement that Stanhope's obligation would remain effective only so long as it remained in business. Appellants assert that *McDole v. Duquesne Brewing Company,* 281 Pa.Super. 78, 421 A.2d 1155 (1980) and *Von Lange v. Morrison–Knudsen Company, Inc.,* 460 F.Supp. 643 (M.D.Pa.1978) support this proposition. Because "[c]ontingencies not provided against in a written agreement will not ordinarily excuse performance," *Swarthmore Boro. v. Philadelphia Rapid Transit Co.,* 280 Pa. 79, 84, 124 A. 343, 345 (1924), we first examine the process of determining when an agreement may be made subject to an implied condition such that the occurrence or non-occurrence of the condition would extinguish a party's duty to perform under a contract.

"An event may be made a condition either by the agreement of the parties or by a term supplied by the court." *Restatement (Second) of Contracts* § 226. Although commentators have classified conditions as express, constructive, implied-in-law and implied-in-fact, we agree with Professor Murray's suggestion that it is preferable to categorize conditions as either express or constructive. J. Murray, *Murray on Contracts,* § 143 (1974). An express condition is one that the parties manifested either by their words or conduct, while a constructive condition is one supplied by

the court in the interest of equity and justice even though the parties did not discuss or consider the matter. *Id.* No particular language is required to create an express condition. "An intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language. Whether the parties have, by their agreement, made an event a condition is determined by the process of interpretation." Restatement, *supra,* comment a. For example, the purpose of the parties in entering the agreement is given great weight. *Id.* As to constructive conditions, comment c of the Restatement § 226 states, "[w]hen the parties have omitted a term that is essential to a determination of their rights and duties, the court may supply a term which is reasonable in the circumstances...." In comment c to the Reporter's Note following § 226, the difficulty in attempting to separate the two types of analyses is discussed.

> Whether a court is inferring a condition from the parties' unclear expression of intention or constructing one as a matter of lawmaking is often unclear, because the processes overlap: the values that encourage a court to construct a condition were usually present when the parties were negotiating and thus support inferences about their actual intentions.

Further, a court should not create a constructive condition if it would clearly conflict with another provision of the contract. 3A Corbin on Contracts (1960) § 653. *See also* Restatement, *supra,* § 227 (Standards of Preference with Regard to Conditions) and § 229 (Excuse of Condition to Avoid Forfeiture).

With these precepts in mind, we direct our attention to *McDole,* in which employees of Duquesne Brewing filed an action in equity seeking injunctive relief and money damages when, due to continued economic losses, Duquesne closed its brewing operation and the employees lost their jobs. The employees contended that their termination was in violation of lifetime employment contracts they had entered into with Duquesne fourteen years earlier.

The chancellor in *McDole* found that the parties, during contract discussions, had not discussed or contemplated the possible shutdown of the brewery. In rejecting the employees' request for relief, the chancellor concluded

> it was the intent and belief of the parties, when the individual employment agreements were negotiated, that Duquesne would continue in the particular business in which the Appellants were employed. The Chancellor stated: "The implied condition that [Duquesne] would continue in the brewing business was breached in 1972 through no fault of either party, and thus, *'frustrated the purpose'* for which the contracts of 1958 were made."

*Id.* 281 Pa.Super. at 82, 421 A.2d at 1157. The trial court *en banc* affirmed the chancellor's denial of relief to the employees, finding that the parties' contemplation of Duquesne's continued corporate existence resulted in an implied condition in the individual contracts of employment.[8] This Court agreed with that conclusion, and noted that the method of payment set forth in contracts, by reference to the current collective bargaining agreement or the prevailing rate of pay in the brewery, offered further support for its conclusion because if the brewery ceased operation, then the provisions would have no sensible application. Lastly, the Court pointed out that other jurisdictions had reached similar conclusions when called upon to interpret lifetime or permanent contracts.

In *Von Lange,* a diversity action relied upon by appellants, an employee and the president/majority shareholder of a corporation participating in a partnership for the manufacture of bonded rail joints, brought an action in their own behalf against the other corporate partner for breach of a sales-representative agreement. The agreement, which was entered into at the same time as the partnership agreement, provided that plaintiffs would sell the rail joints for the partnership. When defendant terminated the partnership, it also terminated the sales-representative agreement.

---

**8.** However, the trial court *en banc* declared that the doctrine of frustration of purpose was inapplicable. *McDole, id.* 281 Pa.Super. at 82, 421 A.2d at 1157–1158.

Plaintiffs asserted that termination of the sales agreement constituted a breach and they sought money damages for the monthly payments provided for in the agreement which had a term of three years. The case was tried non-jury and the district court made findings of fact, conclusions of law, and set forth its reasons for entering judgment in favor of defendant. The court concluded that the termination of the partnership agreement also served to terminate the sales-representative agreement and, alternatively, that an implied term of the sales agreement was the continued existence of the partnership business. The district court specifically found that the sales agreement provided for the possibility of termination, but did not provide for a method of termination. The court noted that where there is no express provision in a contract as to its duration or termination, the intentions of the parties may be determined from factors outside the agreement. The court then examined the circumstances surrounding the execution of the sales agreement and found that the following factors led to the conclusion that the existence of the partnership was an implied condition of the sales-representative agreement:

the Sales Representative Agreement concerned only the sale of bonded rail joints produced by the partnership; the $4,500 monthly payment was solely an advance against commissions to offset expenses in generating sales; the Von Langes under the agreement were to use their best efforts to obtain orders for bonded rail joints, and finally the Sales Representative Agreement specifically referred to termination before expiration of the three-year term.

*Von Lange* at 648–649.

Appellants point to the following similarities between the present case on the one hand, and *McDole* and *Von Lange* on the other: 1) on cross-examination, appellee conceded that the parties did not discuss the prospect of Stanhope discontinuing business prior to entering the 1979 agreement; 2) appellee received commissions under the agreement; 3) appellee's duties were to promote the rental, sale

and purchase of Stanhope's products; and 4) after Stanhope sold its assets, it no longer had a product to market and appellee's entitlement to receive a draw on commissions terminated since he could no longer make sales or market a nonexistent product.

We find, however, that appellants overlook crucial factual distinctions which distinguish *McDole* and *Von Lange* from the case before us.[9] Of critical importance in this case is the fact that the length of the brokerage contract is specified (five years). In *McDole*, however, our Court was construing "lifetime" employment contracts. The panel upheld the chancellor's findings precisely because a wide range of authority holds that "lifetime" employment contracts exist only so long as the employer remains in business. *McDole v. Duquesne Brewing Co.*, 281 Pa.Super. at 85, 421 A.2d at 1159.[10] Because the issues before us concern neither "employment contracts" nor contracts of "lifetime" duration, appellants' reliance on *McDole* is misplaced.

As to *Von Lange*, we initially point out that this Court is not bound by a federal district court's interpretation of state law. *Commonwealth v. Lacey*, 344 Pa.Super. 576, 496 A.2d 1256 (1985). However, we may look to the federal court's analysis if we are persuaded by its logic. *Id.* We agree with the trial court that the present case is distinguishable from *Von Lange* on the basis that the agreement to which Stanhope was bound provides both for specific grounds and a specific method for termination. *Von Lange* involved the interpretation of *two* agreements, both negotiated, executed and made effective as of the same date, by the same parties. In reaching its decision,

---

**9.** Appellants' assertions with regard to *McDole* and *Von Lange* more properly apply to the argument that the trial court erred in directing the verdict in favor of appellee. However, we adhere to the structure of appellants' brief and analyze the cases in terms of the argument for judgment n.o.v.

**10.** Our Court recently held that a contract of employment for life does not, without more, constitute an enforceable contract of employment for a specific, definite duration. *Murphy v. Publicker Industries, Inc.*, 357 Pa.Super. 409, 516 A.2d 47 (1986).

the district court found that the parties' failure to provide for a method of termination in their sales representative agreement made it necessary to look outside that agreement in order to determine whether it was conditioned on the existence of the partnership. To reach its result, the court relied on "a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter that [sic] they should be construed together and interpreted as a whole." 460 F.Supp. at 647. Thus, the holding in *Von Lange*, that the principal was liable to pay the commissions to his agent only so long as the partnership existed, is founded on a narrow set of facts not present in the instant case.

Two other cases cited by appellants as support for their "implied term" argument are distinguishable on their facts. *American Bakery & Confectionery Workers v. Liberty Baking Co.*, 242 F.Supp. 238 (W.D.Pa.1965) and *Fraser v. Magic Chef–Food Giant Markets, Inc.*, 324 F.2d 853 (6th Cir.1963) are inapplicable to this matter because the courts in those cases were construing collective bargaining agreements. Collective bargaining between a labor union and management generally results in a "trade agreement" rather than a "contract of employment." *Amalgamated Association of Street, Electric Railway and Motor Coach Employes (sic) of America, Division 85 v. Pittsburgh Railways Company*, 393 Pa. 219, 142 A.2d 734 (1985). Appellants would have us mix apples and oranges in applying the holdings in those cases to the matter before us. Said the court in *Fraser:*

> Rights of employees under a collective bargaining agreement presuppose an employer-employee relationship. A collective bargaining agreement, in ordinary usage and terminology, does not create an employer-employee relationship nor does it guarantee the continuance of one. Employees' rights under such a contract do not survive a discontinuance of business and a termination of operations.

324 F.2d at 856. Because *Fraser* and *American Bakery* stand only for the narrow proposition that employees' rights under a collective bargaining agreement do not ordinarily survive a discontinuance of business and termination of operations, we decline to follow them in this case.

Our Supreme Court has recently noted that "[t]he law will not imply a different contract than that which the parties have expressly adopted. To imply covenants on matters specifically addressed in the contract itself would violate this doctrine." *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 198, 519 A.2d 385, 388 (1986).

> [Appellants] fail to notice an important distinction in contract law between cases in which parties have agreed on a term, and cases in which they have remained silent as to a material term or have discussed the term but did not come to an agreement. The law will imply a term only for omitted covenants. There can be no implied covenant as to any matter specifically covered by the written contract between the parties.

*Reading Terminal Merchants Association v. Samuel Rappaport Associates*, 310 Pa.Super. 165, 176, 456 A.2d 552, 557 (1983) (citation omitted). Because *McDole* and *Von Lange* are distinguishable, appellants have failed to present any authority, nor has our research revealed any, for the proposition that a trial court may hold, as a matter of law, under evidence similar to that admitted in the present case that a principal may be excused from performing under a brokerage agreement on the ground that it has voluntarily chosen to sell its assets. We have reviewed the evidence admitted at trial—including the agreement itself and appellee's testimony—under the appropriate standard, and we conclude that appellants are not entitled to judgment n.o.v., either by operation of law or under the theory of an implied condition. In sum, by providing for a specific method of termination in the agreement, appellants were bound to follow the terms of the agreement in seeking termination. Therefore, the trial court did not err in concluding that appellants were not entitled to judgment n.o.v.

## C.

■ Next, appellants, in support of their claim that they are entitled to judgment n.o.v. as a matter of law, argue that the agreement provides Stanhope with the exclusive option to terminate plaintiff's employment at any time, subject to six months notice. Their claim focuses on the following language which appears in the termination provisions of the agreement:

> [T]his exclusive Broker's Agreement may be terminated at any time, at the option of Stanhope Steel, Inc.... (3) if for other reasons it is deemed advisable to the best interest of all parties concerned.

R.R. 277a–278a; 744a–746a. Appellants argue that the deteriorating financial condition of Stanhope, which culminated in the sale of its assets and its inability to meet even payroll costs, led to the determination, by Stanhope, that it would be in the "best interest of all parties concerned" to terminate the agreement. Therefore, they submit that the language is unambiguous and that they are entitled to judgment n.o.v. as a matter of law.

The trial court rejected appellants' contention, finding as a matter of law that they could not be heard to say that termination of appellee's contract would be in his best interest. We agree.

Stanhope's option to terminate the brokerage agreement with appellee was limited to those situations in which it would be in "the best interest of *all parties* concerned." Appellants have failed to point to any best interest of the appellee that would be served by his termination. In fact, the only interest served by termination of the agreement was Stanhope's. Their interpretation of the clause suggests that Stanhope had the unfettered discretion to decide what was in the appellee's best interest; however, the language of the clause cannot reasonably be read to support such an interpretation because the clause limits the exercise of the option to situations in which termination would serve the best interest of *all* the parties, including appellee. Moreover, if we were to follow such an interpre-

tation, we would be sanctioning an illusory promise, by which Stanhope has suffered no detriment. *See* J. Murray, *Murray on Contracts* § 76 (1974). If Stanhope wished to exercise the option without any restrictions whatsoever, the agreement could have been written to reflect that intention. By restricting termination to those situations in which the best interest of *all* parties will be served, and by not reading the clause as giving Stanhope the *sole* discretion in terminating appellee, we give effect to the whole agreement and avoid the illogical result of allowing Stanhope to terminate a five-year agreement at will.

### D.

 Finally, Cambridge in support of its argument for judgment n.o.v. argues that the evidence was insufficient to hold it liable for the obligations of its subsidiary, Stanhope, arising out of the agreement. Cambridge submits that the evidence presented at trial established that Stanhope was a separately-operated subsidiary, with separate management, officers, books, records and offices; and, that although appellee was aware of Cambridge's separate existence, he made no attempt to contract with Cambridge. However, Cambridge downplays the fact that, with the exception of Russell Stanhope, all of Stanhope's officers were also officers of Cambridge, and that Henry Lange, the president of Cambridge, was consulted prior to the extension of appellee's contract in 1981.

Appellee argues that the evidence was sufficient to establish either that Cambridge was a party to the contract with appellee, or that Cambridge exercised control over Stanhope's dealings with appellee so that any separation between the corporations was illusory. Appellee relies on the following: all terms of the agreement between appellee and Stanhope were subject to the approval of Cambridge's president, Henry Lange; the agreement was drafted by counsel for Cambridge; Stanhope had to secure the approval of Cambridge's president to extend the agreement, as evidenced by a letter from Stanhope to appellee which stated

that Lange would grant the extension, R.R. 748a, and that appellee was terminated by Lange. Appellee concedes that Lange was purportedly acting as an officer of Stanhope when he terminated appellee, but notes that a subsequent offer of severance pay was made by Lange on stationery bearing the Cambridge name.

The trial court rejected Cambridge's argument, finding that the evidence established that Cambridge, acting through Lange, granted appellee the extension he was working under at the time of termination and that Cambridge terminated the contract. The court also noted that after Stanhope was purchased by Cambridge, it became merely a department of Cambridge. Central to the trial court's conclusion was that although appellants observed many of the requirements for maintaining separate corporate identities, they did not do so in their dealings with appellee. We conclude that the trial court adequately discussed and properly disposed of Cambridge's challenges to the evidence.

In summary, having reviewed the record and the arguments advanced by appellants, we conclude that the evidence was more than sufficient to sustain the verdict. We hold that appellants are not entitled to judgment n.o.v. on this record.

## II. A New Trial

Appellants alternatively argue that if they are not entitled to judgment n.o.v., they are at least entitled to a new trial. They assert that the issue of whether Stanhope's continued existence was an implied condition of the agreement was at least a question of fact for the jury and that the trial court therefore erred in directing a verdict in favor of appellee. Appellants submit that there were disputed issues of material and relevant fact which precluded the entry of a directed verdict, that the issue should have been submitted to the jury, and that the trial court improperly excluded evidence relevant to the issue of whether an implied condition existed. Specifically, appellants allege: that the trial court erred in excluding the testimony of

Stanhope's President as to discussions which occurred during the negotiation of the brokerage agreement; that the language of the termination provision is ambiguous and should have been submitted to the jury; that the doctrines of supervening impracticability and supervening frustration excused Stanhope from performance; and, that the verdict was against the weight of the evidence. We address these issues individually.

■ "The grant or denial of a new trial is within the sound discretion of the trial court, whose decision will be reversed only where the record indicates that the trial court committed an error of law or clearly and palpably abused its discretion." *Walasavage v. Marinelli, supra,* 334 Pa. Super. at 407, 483 A.2d at 515 (citation omitted). Because appellants allege that the trial court erred in excluding evidence concerning the alleged implied condition, we must consider all of the evidence offered by appellants, whether it was admitted or not, in reviewing the propriety of the denial of a new trial. *See Waddle v. Nelkin,* 511 Pa. 641, 515 A.2d 909 (1986) (Zappala, J. announcing judgment of the Court) (unlike a judgment n.o.v., a motion for new trial does not test the verdict itself, but rather, the legal proceedings resulting in the verdict and the basis of a new trial motion is not that the judgment is unsupported by sufficient evidence, but that an alleged trial error affected the verdict); *Stewart v. Chernicky,* 439 Pa. 43, 54–5, n. 11, 266 A.2d 259, 266 n. 11 (1970) (correction of errors in exclusion of evidence may properly be the subject of a motion for new trial). As to the allegation of error regarding the trial court's entry of a directed verdict, we are guided by the following standard.

A directed verdict can properly be granted by a court only if the facts are clear and free from doubt. *Correll v. Werner,* 293 Pa.Super. 88, 90, 437 A.2d 1004, 1005 (1981). In ruling on a motion for directed verdict, a court must "accept as true all facts and proper inferences which tend to support the contention of the party against whom the motion has been made and must reject all

testimony and inferences to the contrary." *Thomas v. Allegheny & Eastern Coal Co.,* 309 Pa.Super. 333, 339, 455 A.2d 637, 639 (1982). Accord: *Correll v. Werner, supra.*

*Person v. C.R. Baxter Realty Co.,* 340 Pa.Super. 537, 540, 490 A.2d 910, 911 (1985). On appeal, we must determine whether the trial court abused its discretion or committed an error of law which controlled the outcome of the case. *Jozsa v. Hottenstein,* 364 Pa.Super. 469, 528 A.2d 606 (1987).

## A.

██ In requesting a new trial, appellants argue that the trial court erred in excluding the testimony of Russell Stanhope, President of Stanhope Steel at the time, as to discussions which occurred during the negotiation of the brokerage agreement and circumstances which existed when the agreement was extended and when Stanhope discontinued its operations. However, neither at trial, nor on appeal, do appellants specifically set forth the nature of Mr. Stanhope's testimony on this issue. They do not allege that he would testify that the parties discussed whether the contractual relationship between them was contingent on the continuance of Stanhope's business. In fact, appellants' offer of proof focused on other matters. Counsel indicated that Mr. Stanhope would testify that the company was losing money and that appellee's agreement was terminated for this reason. There is no indication whatsoever that he would have contradicted appellee's testimony that the issue concerning the continued operation of Stanhope was never discussed before the agreement was signed. If Mr. Stanhope's testimony would have been that the matter was never discussed, then appellants were not prejudiced by the exclusion of his testimony since they were able to establish the same point when they cross-examined appellee. Therefore, we conclude that the trial court did not err in denying appellants' motion for a new trial on that basis.

Appellants also argue that *McDole* requires that the issue of whether the parties intended the agreement to survive the discontinuance of Stanhope's operations should have been submitted to the jury because it was a factual issue. Under the facts and law of the present case, we find no error in the trial court's entry of a directed verdict in favor of appellee against Stanhope and, therefore, appellants are not entitled to a new trial.

## B.

 We must also reject appellants' claim that the language of the termination provision of the agreement is ambiguous and should have been submitted to the jury in order for it to resolve the ambiguity. In *Hutchison v. Sunbeam Coal Corp., supra,* the Supreme Court set forth the following guide for courts presented with a claim that a provision of a contract is ambiguous.

> Determining the intention of the parties is a paramount consideration in the interpretation of any contract. *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 143, 302 A.2d 347, 351 (1973); *Unit Vending Corp. v. Lacas,* 410 Pa. 614, 617, 190 A.2d 298, 300 (1963). The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. *Steuart v. McChesney,* 498 Pa. 45, 48–49, 444 A.2d 659, 661 (1982); *In re Estate of Breyer,* 475 Pa. 108, 115, 379 A.2d 1305, 1309 (1977). However, as this Court stated in *Herr Estate,* 400 Pa. 90, 161 A.2d 32 (1960), "where an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances." *Id.,* 400 Pa. at 94, 161 A.2d at 34.

We first analyze the lease to determine whether an ambiguity exists requiring the use of extrinsic evidence. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Metzger v. Clifford Realty*

*Corp.*, 327 Pa.Superior Ct. 377, 386, 476 A.2d 1, 5 (1984); *Commonwealth State Highway and Bridge Authority v. E.J. Albrecht Co.*, 59 Pa.Commonwealth Ct. 246, 251, 430 A.2d 328, 330 (1981). *See also Black's Law Dictionary* 73 (Rev. 5th ed. 1979). The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact. *Easton v. Washington County Insurance Co.*, 391 Pa. 28, 137 A.2d 332 (1957); *Fischer & Porter Co. v. Porter*, 364 Pa. 495, 72 A.2d 98 (1950). *See generally* 4 Williston on Contracts § 616 (3d ed. 1961).

*Id.* 513 Pa. at 200–01, 519 A.2d at 389–90. In the present case, the trial court correctly concluded that the language was not ambiguous and could not reasonably be interpreted in the manner advanced by Stanhope; hence, it did not err in refusing to submit the issue to the jury.

## C.

██ Appellants argue that they are entitled to a new trial on the issue of whether Stanhope was excused from performance under the brokerage agreement by virtue of the doctrines of supervening impracticability and supervening frustration. Under the doctrine of supervening impracticability, a party's duty to perform pursuant to a contract is discharged where such performance is made "impracticable," through no fault of its own, "by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made." *Restatement (Second) of Contracts* § 261. Comment d to § 261 defines "impracticable:"

Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved. A severe shortage of raw materials or of supplies due to war, embargo, local crop failure, unforeseen shutdown of major sources of supply, or the like, which either causes a marked increase in cost or prevents performance altogether may bring the case

within the rule stated in this Section. Performance may also be impracticable because it will involve a risk of injury to person or to property, of one of the parties or of others, that is disproportionate to the ends to be attained by performance. However, "impracticability" means more than "impracticality." A mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials, or costs of construction, unless well beyond the normal range, does not amount to impracticability since it is this sort of risk that a fixed-price contract is intended to cover.

The doctrine of supervening frustration is set forth in § 265 of the *Restatement.* That section states:

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

*Restatement (Second) of Contracts* § 265.

Stanhope was permitted to make a detailed offer of proof of the evidence it would present in support of its defense which was based on the financial problems Stanhope was experiencing at the time of plaintiff's termination, but the trial court refused to allow the matter to go to the jury. R.R. 421a–435a. According to appellants:

The evidence which Stanhope sought to introduce demonstrates that: (1) Stanhope was losing vast amounts of money during the 1980–1983 period (R.R. at 421a–430a); (2) Cambridge advanced and loaned Stanhope vast amounts of money during the 1980–1983 period (R.R. at 434a); (3) Stanhope's largest creditor advised Stanhope that it would not [sic] longer advance funds (R.R. at 434a–435a); and (4) at the time Stanhope terminated Dorn's contract, it did not have enough money to pay its operating expenses and payroll costs (R.R. at 432a).

Appellants' brief at 29. This, coupled with the increase in interest rates, was the basis of Stanhope's justification of its discussion to terminate the agreement. Appellants argue that the trial court's exclusion of this evidence, and its refusal to submit the issue to the jury, was erroneous and entitles appellants to a new trial.

We are unpersuaded by appellant's arguments and we conclude that the trial court did not err in refusing to submit the matter to the jury. Stanhope created the supervening event by selling its business. Although appellants have argued that Stanhope was compelled to take this action as a result of market forces beyond its control, we agree with the trial court that the doctrines of commercial impracticability and frustration of purpose are to be applied sparingly and, on the basis of the record before us, including appellants' offer of proof, we conclude that appellants have failed to make out that the change in the business environment was "well beyond the normal range." *See W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 768 n. 12, 103 S.Ct. 2177, 2185 n. 12, 76 L.Ed.2d 298 (1983) ("Economic necessity is not recognized as a commercial impracticability defense to a breach-of-contract claim."); *Louisiana Power & Light Co. v. Allegheny Ludlum Industries, Inc.*, 517 F.Supp. 1319 (E.D.La.1981) (mere fact that performance under contract would have deprived defendant of its anticipated profit and resulted in loss on contract was insufficient to show commercial impracticability, there being requirement of showing not only that defendant would perform at a loss, but also that loss would be especially severe and unreasonable). This distinction must be carefully heeded, otherwise, every agreement that becomes disadvantageous to a party, as a result of a subsequent downturn in the economy, would entitle that party to be excused from performing under the agreement.[11]

11. We note that Stanhope's offer of proof detailed the losses its overall operation experienced in the early 1980's. Extended analysis of this event, however, obscures the relevant issue of whether enforcement of the contract at issue—between appellee and Stanhope—would be impracticable.

Appellants cite *Gulf Oil Corp. v. Federal Power Commission,* 563 F.2d 588 (3rd Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1977) for the proposition that a party's contractual obligations may be excused by commercial impracticability where "the cost of performance has in fact become so excessive and unreasonable that the failure to excuse performance would result in grave injustice." *Id.* at 599. We think appellants' reliance on this case is unjustified. Gulf entered into a "Gas Purchase Contract" to deliver on a daily basis a large, specified quantity of natural gas to the pipelines of the Texas Eastern Transmission Company. Gulf had expected to obtain most of the gas from a nearby field in Plaquemines Parish, Louisiana, but it soon became evident to Gulf that it had vastly overestimated the reserves of that field. Gulf argued that because neither party had "entertained the thought that Gulf would be required to deliver gas from far off places at ... 'exorbitant' costs," the contract should be modified. *Id.* at 599. Under the facts of that case, the Third Circuit panel rejected a contention similar to that which appellants make in the case at bar, i.e., that performance may be excused if the cost of performance becomes so excessive and unreasonable as to make performance impracticable. The court held, "[t]he party seeking to excuse [its] performance [under the doctrine of supervening impracticability] must not only show that [it] can perform only at a loss but also that *the loss will be especially severe and unreasonable* " (emphasis added). *Id.* at 600. The court found that Gulf had failed to make such a showing.

Appellants, in their offer of proof, have not demonstrated that they had intended to make such a showing here. Supervening impracticability cases such as *Gulf Oil, Louisiana Power and Light,* and *Aluminum Co. of America v. Essex Group, Inc.,* 499 F.Supp. 53 (W.D.Pa.1980), each involve a particular contract which had become onerous and threatened the financial health of the company. However, in the matter before us, nowhere have appellants alleged that *their contract with appellee* is at the root of their alleged corporate losses. Rather, appellants attempt to

turn the doctrine of supervening impracticability on its head and argue that because the business is failing for reasons completely unrelated to the contract in dispute, their obligations should be extinguished. We find no precedent in the law for such an argument, and appellants have provided us with none. Moreover, comment b to § 261 states that the continuation of the financial situations of the parties are ordinarily not basic assumptions which would affect a discharge. Events falling within the coverage of § 261 are generally due either to so called "acts of God" or the acts of third parties. Also, if the event that prevents the obligor's performance is caused by the obligee, it will ordinarily amount to a breach by the latter and will not be covered by § 261. "[A] party generally assumes the risk of his own inability to perform his duty." *Restatement (Second) of Contracts* § 261, comment e. This comment was cited with approval in *Craig Coal Mining v. Romani*, 355 Pa.Super. 296, 513 A.2d 437 (1986). Having reviewed appellants' arguments and the relevant authorities, we conclude that the trial court did not err in denying appellants' motion for a new trial on the basis of the doctrine of supervening impracticability.

Likewise, appellants' reliance on the doctrine of supervening frustration is misplaced.[12] Comment b to § 265 clearly states that the doctrine applies "only when the frustration is without the fault of the party who seeks to take advantage of the rule." Further, the illustrations to comment a of § 263 emphasize this point. The trial court did not err in refusing to grant appellants a new trial on this issue.

## D.

 Finally, Cambridge argues that the trial court erred in charging the jury on when a parent corporation can be

12. Appellants incorrectly cite *Olbum v. Old Home Manor, Inc.*, 313 Pa.Super. 99, 459 A.2d 757 (1983), in support of their argument that the doctrine of supervening frustration applies in the instant matter. In deciding *Olbum,* our Court relied on principles of commercial impracticability as embodied in the *Restatement (Second) of Contracts* § 263.

held liable for the obligations of its subsidiary, and that the verdict was against the weight of the evidence. We do not address the allegations of error regarding the charge to the jury because they have been waived by appellants' failure to raise them in the statement of questions involved, as required by Pa.R.A.P. 2116.[13]

The argument as to the weight of the evidence has been preserved. Appellant Cambridge asserts that "[t]he evidence overwhelmingly established that Cambridge carefully maintained the separateness of the two corporations," appellants' brief at 37, and that this entitles it to a new trial. We disagree.

A panel of this Court has stated:

A motion for new trial on grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence. Whether a new trial should be granted on grounds that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial judge, and his decision will not be reversed on appeal unless there has been an abuse of discretion.

*Commonwealth v. Taylor,* 324 Pa.Super. 420, 425, 471 A.2d 1228, 1230 (1984) (citations omitted). On appeal, this Court must determine "whether the verdict is so contrary to the evidence as to shock one's sense of justice." *Myers v. Gold,* 277 Pa.Super. 66, 419 A.2d 663 (1980). To summarize what we already have noted in Part I.D. of this opinion, appellee testified at trial that the President of Cambridge, Mr. Henry Lange, actively participated in the contract discussions between appellee and Stanhope. R.R. at 229a–231a. Cambridge's attorney, Mr. Rosenberg, drafted the contract which was eventually signed by the parties. R.R. at 230a.

---

**13.** Pa.R.A.P. 2116 states that "ordinarily[,] no point will be considered [on appeal] which is not set forth in the statement of the questions involved or suggested thereby." Nothing in appellants' third question ("Whether Cambridge Industries—Stanhope's parent corporation—can be held liable for Stanhope's contractual obligations?") suggests their intention to raise the issue of an erroneous or prejudicial jury charge.

The letter terminating appellee's agency relationship with Stanhope was signed by Mr. Lange. R.R. at 254a, 296a and 762a. A letter which followed two weeks later, stating Stanhope's intention to provide appellee with three months severance pay, was written on Cambridge letterhead and signed by Mr. Lange. R.R. at 763a. We find appellant Cambridge's argument to be wholly without merit and conclude that under the standard articulated in *Myers*, a new trial is not warranted.

Judgment affirmed.