Fischer & Porter Company, Appellant, *v.* Porter.

Argued January 13, 1950. Before MAXEY, C. J., DREW, LINN, STERN, STEARNE and JONES, JJ.

reargument refused April 10, 1950.

*Henry S. Drinker,* with him *Albert M. Hoyt, Jr.,* for appellant.

*D. Stewart McElhone,* with him *Edward B. Duffy* and *Desmond J. McTighe,* for appellee.

OPINION BY MR. JUSTICE JONES, March 20, 1950:

The plaintiff corporation sued on a written contract to recover from the defendant the amount of a Federal income tax refund received by the defendant for a specified year covered by the contract. The questions on this appeal are (1) did the construction of the contract present a question of law for the court or one of fact for the jury and (2) if the former, what was the intent of the parties as evidenced by the terms of the contract.

In December 1937, Kermit Fischer admitted George K. Porter, the defendant, to partnership with him in an instrument-manufacturing business owned and conducted by Fischer who furnished all of the capital of the partnership. For some time prior, Porter had been an employee of Fischer. The partnership endured until May 1942 when the partners incorporated the business, Porter's share of the capital stock of the corporation being paid for out of the accumulated profits then standing to his credit on the books of the partnership. The corporation (Fischer & Porter Company), whereof

Fischer became president and Porter secretary, is the present plaintiff. At the end of 1942, Fischer and Porter had a disagreement and, in consequence, Porter's employment by the company was terminated on December 30, 1942. He promptly retained counsel to represent him and from then until early March 1943, the contract, here in suit, was negotiated; it was signed by the parties on March 11, 1943, each of them having acted throughout on the advice of respective counsel.

By the terms of the contract Porter sold to the company, for a specified sum, all of his stock in the company. It so happened that he had received from the business for the year 1942 a large taxable income whereon his Federal tax would be $40,723.71. He asked that he be relieved of this tax liability by the agreement. To that, Fischer assented. Accordingly, the company undertook in the contract to pay whatever income taxes should be owing by Porter for the year 1942 [1] and, also, any deficiency of income taxes as might later be found owing by him for the years of the partnership prior to 1942. A correlative provision of the contract provided that any moneys which might come to Porter "by reason of any claims for refund of income taxes" should belong to the company; and Porter expressly agreed to pay over any such refunds to the company forthwith upon his receipt of them. The presently relevant provisions of the written contract are as follows:

"1. . . .

"(e) PORTER hereby assigns, transfers and sets over unto COMPANY, its successors and assigns, any and all claim or claims for refund or refunds of his Income Taxes which may now exist or hereafter come into being, by reason of overpayment of the same for

---

[1] This was accomplished by increasing the company's payment to Porter so that, when reduced by his tax liability therefor, netted him the amount of the contract consideration.

the years 1937 to 1942, both inclusive, and agrees to execute any and all documents, which in the opinion of COMPANY'S representatives or counsel are or shall be necessary to obtain such refunds. PORTER further agrees that any moneys which may come to him by reason of any claims for refund of income taxes shall be held by him in trust for COMPANY and forthwith paid over to COMPANY, its successors or assigns. . . .

"2. In addition to the payment to PORTER . . . [of the purchase price] as above set forth, COMPANY further agrees to do and perform the following:

"(a) To pay to the Collector of Internal Revenue such sum or sums of money as may appear to be due for or upon PORTER'S partnership income and income as a salaried employee of COMPANY, for the calendar year 1942, and, if any may be due, for years prior to 1942, said payment of PORTER'S income tax liability to be paid in four installments, commencing March 15, 1943, and on June 15, 1943, September 15, 1943, and December 15, 1943, or sooner."

There was a further express covenant by the company to save Porter harmless from personal liability on account of any belated payments by the company of such deficiency tax liabilities of Porter.

It is readily evident what the parties hoped to accomplish by these provisions of the contract: The company was to discharge Porter's income tax liability for the year 1942 and, also, was to pay promptly any future deficiency assessments against him for income tax liability for the years of the partnership (i.e., 1937 to 1942), while Porter, on his part, was to assign and transfer to the company any claims to refunds of income taxes that he might have for any of the years from 1937 to 1942, both inclusive.

On June 9, 1947, Porter received a refund on account of his Federal income taxes for the year 1941. He had made application therefor under the provisions of the

amendatory Act of Congress of October 21, 1942 (Revenue Act of 1942, Sec. 153, 56 Stat. 798, 26 U. S. C. A. §122), which had become effective October 21, 1942. Under that enactment, a taxpayer whose tax return for any year thereafter shows a loss in net income has a right to carry back such loss to his return of income for the earlier of the two years immediately preceding the year of such loss (not prior to the year 1941, however) and offset the loss against the net income shown by his return for the earlier of the two years. On the basis of the net taxable income for that year, as thus adjusted, the taxpayer is entitled to a *pro tanto* refund on account of that year's taxes. If the loss is sufficient to offset *in toto* the net taxable income for the earlier of the two "carry-back" years, then the taxpayer receives a refund for the whole of the income tax paid by him for the earlier year, and, any residue of the "carry-back" loss, still remaining, is applicable to the net taxable income returned for the succeeding or second year of the "carry-back" period for similar adjustment of the net income for that year and a refund of taxes accordingly. As is already apparent, the amendment of 1942, supra, *was on the statute books and in full force and effect when the contract here in suit was negotiated and executed.*

For the calendar year 1943, which was the year following Porter's separation from the company, his income tax return showed a net loss of $16,733.86. By carrying back this loss and offsetting it against his net income of $43,378.61 for 1941, as shown by his return for that year, Porter had an adjusted net income, subject to tax, for the year 1941 of $26,644.75 and a right to a corresponding refund for that year of $8,777.32. It is that sum, together with interest thereon of $1,187.82, for a total of $9,965.14, which Porter received as a tax refund for 1941 and which he refused to turn over to the company.

In his amended affidavit of defense, Porter admitted the contract and his receipt of the refund, as above stated, but denied that it represented a refund "by reason of overpayment of (income taxes) for the years 1937 to 1942, both inclusive" and further alleged that "this type of 'refund' [i.e., because of the "carry-back" provision of the law] was not one which was within the contemplation of the parties at the time they executed the contract."

The plaintiff moved for judgment on the pleadings which the court below refused. The case then went to trial and terminated in a verdict for the defendant whereon judgment was entered; and the plaintiff appealed. The errors ascribed to the court below are its refusal to construe the written contract as a matter of law, the admission of parol testimony of the defendant as to what character of refunds he understood the contract covered, submitting to the jury the interpretation of the word "overpayment" as employed in the contract and the failure of the court en banc to enter judgment n. o. v. for the plaintiff.

It was error for the court below not to interpret the written contract as a matter of law. The contract was neither ambiguous nor of doubtful meaning. The several technical terms which it contained were but appropriate words of art, essential in the circumstances to a clear and adequate definition of the intended subject matter. It is fundamental that "Technical terms and words of art are [to be] given their technical meaning unless the context or a usage which is applicable indicates a different meaning": Restatement, Contracts, §235(b). And, this rule is especially applicable where the words of art used are legal terms: 17 C. J. S. §302, p. 720. See also Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §533. Particularly, the terms of a contract requiring the application of a statute are to be con-strued according to their meaning as used in the statute:

cf. *J. M. Davis Company v. Shaler Township*, 332 Pa. 134, 138, 2 A. 2d 708.

The presently pertinent Internal Revenue Code specifically recognizes that an "overpayment" results from an application of the "carry-back" provision of the Act of 1942, supra: see 26 U. S. C. A. §3771, Pkt. Part. That section treats with "Interest on Overpayments", and subdivision (e) thereof is expressly applicable to *"claims [for refund] based on carry-back of loss or credit"* (Emphasis supplied). In general, payments of income taxes in excess of the amount ultimately determined to be due are overpayments within the contemplation of the Internal Revenue Code regardless of whether the excessive payment resulted from carelessness or mistake on the part of the taxpayer or from operation of law. Supplement O of the Internal Revenue Code, entitled "Overpayments" since 1924, deals with the right to refunds of overpaid income taxes and, since 1928, Section 321 of Supplement O has defined as an overpayment the payment of more tax than the amount determined to be due. Throughout the Internal Revenue Code, the term "overpayment" is used as basic to all types of refunds including refunds for taxes correctly assessed in amount, *when paid,* but later remitted or reduced because of subsequent events. See Supplement O. Here, as already indicated, the "carry-back" provision, which was responsible for the defendant's refund on account of his 1941 income taxes, was a part of the law when the contract was executed. In *Beaver County Building and Loan Association v. Winowich*, 323 Pa. 483, 489, 187 A. 481, Mr. Justice STERN, speaking for this court, declared that,—"In determining what constitutes the obligation of a contract, no principle is more firmly established than that the laws which were in force at the time and place of the making of the contract enter into its obligation with the same effect as if expressly incorporated in its terms: [citing cases]."

It was incumbent upon the court below to construe the word "overpayment" as a matter of law in strict accordance with its well-known intendment as used in the Internal Revenue Code and as affected by the "carryback" provision of the Act of 1942, supra. The only suggestion of obscurity in the contract was that which the learned trial judge mistakenly imputed to it because of his misunderstanding the technical significance of the word "overpayment" in the premises. As the present Chief Justice aptly quoted in *Moore v. Stevens Coal Company*, 315 Pa. 564, 568, 173 A. 661,—"It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly."

There was no occasion for the trial court's reception of parol evidence to limit or qualify the legal import of the term "overpayment" in its relevant context. What the defendant sought to do was ". . . to create an ambiguity in the contract by parol testimony when no ambiguity exist[ed] in the writing": *Dahath Electric Company v. Suburban Electric Development Company*, 332 Pa. 129, 133, 2 A. 2d 765. It is only where there is doubt, uncertainty or ambiguity as to the meaning of the words of a contract that parol evidence may be admitted to explain the sense in which the parties presumably used them and which then becomes a question for the jury. The cases and text authorities cited and relied upon by the learned court below in this connection are not presently pertinent. There was no issue which the jury could competently determine. And, the conclusion reached by it was necessarily the veriest guess. Nor was anything more than that to be expected. The learned trial judge, himself, observed to counsel at a side-bar conference that he doubted whether the jury knew "what it was all about." Not only were the defendant's unexpressed

thoughts at the time of the execution of the contract legally incompetent to vary its meaning (see *National Realty Appraisal Company v. Art Club of Philadelphia,* 129 Pa. Superior Ct. 99, 105, 195 A. 139) but even the improperly admitted oral testimony failed to support the limitation which the defendant sought to impose on the word "overpayment".

Thus, the defendant testified that it was his understanding that the provision of the contract with respect to ". . . refunds of his Income Taxes . . . by reason of overpayment of the same for the years 1937 to 1942 . . ." was meant to refer to such refunds as might become payable to him if the so-called Ruml Plan, then being debated in Congress at the time the contract was negotiated and signed, should ultimately become law. As is well known, the Ruml Plan was designed to make income taxes payable currently with the taxpayer's receipts of income and was effectuated in part by statutory provision for partial forgiveness in certain circumstances of the taxpayer's liability for tax on his income for the preceding year. As matters transpired, the defendant did not become entitled to any tax "forgiveness" by virtue of the Ruml Plan in the form in which it was finally enacted into law. He professes, however, that, had he obtained a refund under the provisions of the Ruml Plan, he would have been required under the terms of the contract to assign it to the plaintiff forthwith. For what reason could he be liable to the company under the contract for a possible refund under a law (viz., the Ruml Plan), which was not enacted until approximately three months after the contract had been executed, and, yet, not be liable for an actual refund of income taxes for one of the specified years under the "carry-back" provision that was already on the statute books when the contract was signed? The answer is obvious. Indeed, the defendant's peculiar concession impugns the

integrity of his professed understanding. The terms of the contract, as written, are too plain and meaningful to permit of the injection of doubt on the basis of defendant's later self-serving statements as to what he thought the contract was intended to mean. While not important, it is not unnoteworthy that the defendant did not call, as a corroborating witness to his alleged understanding of the provisions respecting refunds, the counsel who had advised him throughout the negotiation and execution of the contract. In any event, its clearly expressed intent admits of no legal doubt that the defendant is liable to the company for the amount of the refund which he actually received on account of his 1941 income taxes.

Judgment reversed with directions that judgment for the plaintiff be entered by the court below for the amount of the claim with interest.