# Custer v. Somerset Manor Associates

*Robert I. Boose II*, for plaintiff.
*Jon A. Barkman,* for defendant.

COFFROTH, *S.J.,* March 8, 1989 — This case is here on plaintiff's motion for judgment on the pleadings made orally at argument and without objection to the form or timeliness thereof, and on defendant's motion for arbitration pursuant to the contract of the parties.

This is a civil action in equity brought by the executrix of a deceased general partner, Robert L. Custer, plaintiff, against the limited partnership of which he was a member, Somerset Manor Associates, defendant, to recover the value of decedent's partnership interest, requesting an accounting, payment of expense and counsel fee, and general relief. We deal first with the defense motion for arbitration as presented in the following

## QUESTION AT ISSUE

Is a dispute between the estate of a deceased general partner and his limited partnership, over whether the estate is entitled on death to receive the value of decedent's partnership interest, arbitrable under the provision of the partnership contract which mandates arbitration of "any dispute under this agreement," where the relevant provisions of the contract are:

(1) "The partnership . . . shall continue until February 9, 2027, unless sooner terminated under this agreement," and

(2) Liquidation and distribution of the partnership assets to partners is provided for "Upon the dissolution of the partnership . . . ," and

(3) "Upon the death of a general partner, the remaining general partner(s) have the right to continue the partnership" which in fact occurred, and

(4) "This agreement shall be binding upon and inure to the benefits of the parties, their respective heirs, personal representatives, successors and assigns," and

(5) There is no specific mention of the right of the estate of a deceased general partner to payment at death of the value of his partnership share?

Since we answer the question of arbitrability in the affirmative, we do not reach the merits of the motion for judgment.

## DISCUSSION

### Contentions of the Parties

Defendant's motion for arbitration is based on the contention that the dispute in the case is a "dispute under" the agreement involving interpretation of

the contract, not merely of partnership law, which in turn is based on the following propositions:

(1) The main issue is whether Custer's death caused a "dissolution[ment," sic] of the partnership, which is covered by the provisions of the contract, and

(2) Contracts for arbitration should be liberally construed in favor of arbitration unless it can be stated with positive assurance that the dispute was not intended to be arbitrated, and

(3) The nature of the partnership business (long-term financed investment in real estate) makes it reasonable that there should be no liquidation or distribution of a deceased general partner's share until dissolution.

Plaintiff's opposition to arbitration is based on the contention that the instant dispute does not arise under and is not to be solved by the contractual provisions, because:

(1) The "agreement is silent as to the rights of the estate of a deceased general partner," and

(2) Arbitration agreements are to be strictly construed and not extended by implication, and arbitration of an issue must be agreed to in a clear and unmistakable manner, and

(3) The rights of the estate of a deceased general partner are covered by provisions of the partnership statutes in favor of plaintiff, and

(4) It is unreasonable to construe the agreement as postponing liquidation or distribution of the deceased partner's share and the closing of his estate until the year 2027, some 38 years.

## Arbitrability, General Principles

At the outset, it is vital to a proper resolution of our question that we keep in mind that we are de-

ciding only *arbitrability* of the dispute, that is, whether the merits of plaintiff's claim shall be decided by arbitrators or by this court; and since we have concluded in favor of arbitrability, we will not decide the main dispute in the case. Arbitrability in this case is a matter of contract; hence, absent an agreement to arbitrate an issue, the parties cannot be compelled to arbitrate that issue. *Lincoln University v. Lincoln University Chapter*, 467 Pa. 112, 119, 354 A.2d 576, 580 (1976); *Hoffman v. Gekoski*, 250 Pa. Super. 49, 53, 378 A.2d 447, 448 (1977). So, the question presented now is simply whether in the contract between the parties they have agreed to arbitrate the merits of plaintiff's claim, and if they did, to order arbitration without deciding the merits. This question of arbitrability of an issue must, when challenged, be decided by the court prior to submission to arbitration, not by the arbitrators after submission. See *Women's Society v. Savage*, 440 Pa. 34, 269 A.2d 888 (1970); *Philadelphia Marine Association v. Longshoreman's Association*, 382 Pa. 326, 115 A.2d 419 (1955); *Goldstein v. ILGWU*, 328 Pa. 385, 196 Atl. 43 (1938); *Goslin Inc. v. LGC Exports Inc.*, 334 Pa. Super. 132, 482 A.2d 1117 (1984); *Hassler v. Columbia Gas Transmission Corp.*, 318 Pa. Super. 302, 464 A.2d 1354 (1983). In deciding arbitrability, the court "is limited to the question of whether an agreement to arbitrate was entered into and whether the dispute involved falls within the *scope of the arbitration provision.*" *Flightways Corp. v. Keystone Helicopter Corp.*, 459 Pa. 660, 331 A.2d 184 (1975) (emphasis supplied); *Muhlenberg Township School District Authority v. Pennsylvania Fortunato Constuction Co.*, 460 Pa. 265, 323 A.2d 184 (1975).

The cases do not clearly define the phrase "scope of the arbitration provision": in fact, that phrase is not universally used in the opinions to describe the

standard for determining arbitrability under a contract. See, for example: *Flightways, supra,* whether the language did or did not *"embrace* the disputes in issue"; *Women's Society v. Savage, supra,* " . . . whether this dispute is one that is *covered* by the terms of the arbitration agreement . . . "; *Ambridge Borough Water Authority,* 458 Pa. 546, 551, 328 A.2d 498, 501 (1974), " . . . whether the dispute in question falls within the *purview* of the [contractual] submission"; *Neshaminy Federation of Teachers v. Neshaminy School District,* 501 Pa. 534, 462 A.2d 629 (1983), " . . . whether the terms of the agreement *encompass* the subject matter of dispute"; *North Star School District v. PLRB et al.,* 35 Pa. Commw. 429, 386 A.2d 1059 (1978), appeal from this court, whether or not the dispute *"falls within* the arbitration clause," accord: *Wolf v. Baltimore,* 250 Pa. Super. 230, 378 A.2d 911 (1977). (emphasis supplied in all cases above)

As stated in *Hade v. Nationwide Ins. Co.,* 349 Pa. Super. 541, 546, 503 A.2d 980, 983 (1986):

"[I]t has been explicitly held that whether a given dispute is within the terms of an arbitration agreement is for the court to determine, *provided that issue is not intertwined with the merits of the claim. Sharon Steel Corp. v. Jewell Coal & Coke Co.,* 735 F.2d 775 (3d Cir. 1984) . . . " (emphasis supplied)

In *Sharon, supra,* a trial judge denied arbitration on the ground that the arbitration clause did not cover the particular dispute in suit, but the appellate court reversed, saying of the trial judge's interpretation of the contract:

"This is a reasonable interpretation of the contract, and it may well prove to be the correct one. However, we do not believe that it was appropriate for the district court to make it. So long as the

appellant's claim of arbitrability was *plausible,* interpretation of the contract should have been passed on to the arbitrator." 735 F.2d at 778. (emphasis supplied)

Another frequently used criterion for arbitrability, which we prefer as most descriptive, is that the case will go to arbitration if the main dispute in the case is *arguably* within the scope, coverage or purview of the contractual language, that is, that coverage is "susceptible of reasonable argument." See *Hollinger v. Department of Public Welfare,* 469 Pa. 358, 365 A.2d 1245 (1976). As stated in *North Star School District, supra:*

"The issue we must decide, therefore, is whether or not the grievance between the parties arguably involves an interpretation of one of the provisions of the agreement. See *Oxford Board of School Directors v. Pennsylvania Labor Relations Board,* 31 Pa. Commw. 441, 376 A.2d 1012 (1977)."

See also the slip opinion of this court of August 1, 1977, at 18-20, in *North Star* citing, inter alia, *Grunwald-Marx v. Los Angeles,* 343 P.2d 23, 32 (Cal. 1959) and *Sears Roebuck v. San Diego,* 553 P.2d 603 (Cal. 1976). If coverage by the agreement's arbitration clause is reasonably arguable, it follows that the merits in an issue " . . . involving the interpretation of the contract and its resolution is for the arbitration process to determine." *Kwalik v. Bosacco,* 329 Pa. Super. 235, 478 A.2d 50 (1984).

### Arbitrability — This Case

We conclude that is is reasonably arguable that proper disposition of plaintiff's claim is a matter of contractual interpretation for the following reasons:

(1) The sole provision in the contract for paying to a partner the value of his share in the partnership is

paragraph 8.2 thereof which becomes operative only upon "dissolution of the partnership," under the principle that, absent contrary indication, the mention of specific matter excludes others not mentioned (expressio unius est exclusio alterius). See *Commonwealth v. Charles,* 270 Pa. Super. 280, 411 A.2d 527 (1979).

(2) The general principle of law is that the death of a general partner dissolves the partnership (subject to winding up by liquidation) unless otherwise agreed. P.L.E., Partnership §201 (general partnership) and §313 (limited partnership). In this case it has been "otherwise agreed." Thus, as between the parties, the partnership contract is the law of the partnership. *Meek Estate,* 53 D.&C. 2d 207 (1971). The foregoing is apparent under both the partnership contract and the partnership statutes, as follows.

### *Statutes*

The Limited Partnership Act of 1917, P.L. 55 as amended (pursuant to which the instant partnership was formed), §20, 59 P.S. §204, provides:

"§204. *Effect of retirement, death, or insanity of a general partner —*

"The retirement, death, or insanity of a general partner dissolves the partnership, unless the business is continued by the remaining general partners —

"(a) Under a right so to do stated in the certificate, or

"(b) With the consent of all members." April 12, 1917, P.L. 55, §20.

Its successor, the Uniform Limited Partnership Act of 1975, P.L. 524, now in effect, contains precisely the same provision in 59 Pa.C.S. §534.[1]

---

1. Section 502(2) of the 1975 Act, 59 Pa.C.S., states that limited partnerships formed under the 1917 Act are governed by the 1975 Act.

Here, the partnership "business is continued by the remaining general partner[s] — (a) under a right to do so as stated in the certificate," paragraph 13 of which states:

"In the event of death, retirement or insanity of a general partner, the remaining general partner may continue the partnership business."

Hence, by virtue of the certificate's language, the death of Mr. Custer did not dissolve the partnership.

### Partnership Contract

Paragraph 8.1 of the contract contains a similar provision in the following language:

"8.1. *Cause of Dissolution* —

"Upon the death, retirement or insanity of a general partner, the remaining general partner(s) have the right to continue the partnership, or if no general partner remains, the limited partners have the right to continue the partnership by designating a new general partner."

Pennsylvania law is stated in the black-letter rule of P.L.E., Partnerships §211 as follows:

"§211. *Continuance of Business of Firm* —

"While generally the partnership dissolves upon the death of a partner thereof, and the surviving partner has no authority to continue the partnership business, the partners may provide by express agreement that the partnership continues after the death of one of them."

It is reasonably arguable that continuation of the partnership after Mr. Custer's death has the effect of non-dissolution, under both the contract and the statutes. This conclusion is further indicated by the express provision in the contract (paragraph 1.2) fixing a specific term for duration of the partnership; paragraph 1.2 states:

"1.2. *Commencement and Term of Partnership* —

"The partnership shall commence on the February 10, 1975, and shall continue until February 9, 2027, unless sooner terminated in accordance with the provisions of this agreement."[2]

An earlier termination (dissolution) of the partnership would occur upon death of a general partner "in accordance with the provisions of this agreement" in the event the remaining general partner did not, after a general partner's death, elect to continue "the partnership" under paragraph 8.1, *supra* of the contract (and paragraph 13 of the partnership certificate). Since the option to continue was admittedly exercised here,[3] and there is no other contractual provision for dissolution, there will be no dissolution under the contract (or the certificate) until February 9, 2027 (absent further contrary agreement of the parties).

(3) There being no dissolution of the partnership on Mr. Custer's death, there is no liquidation or settlement of accounts, and his estate is not therefore presently entitled to payment of the value of his share as claimed, unless otherwise provided for in the certificate, the statues or the contract. Examination of those sources shows that there is not only no provision otherwise, but that the language of both the contract and the statutes arguably confirm the general principle above stated:

(a) *Certificate*: Contains no provision on the subject.

(b) *Contract*: Contains one provision on the subject, paragraph 8.2 thereof which provides as follows:

---

2. Paragraph 7 of the limited partnership certificate states: "The partnership will exist from February 10, 1975, the date of filing this certificate of limited partnership, until February 9, 2027 or until prior dissolution as provided in agreements of limited partnership."

3. Compare 59 Pa.C.S. §336(b).

"8.2. *Liquidation Procedures* —

"*Upon the dissolution of the partnership,* the assets of the partnership shall be liquidated, and the resultant funds shall be applied in the following order after any gain or loss to be allocated to the parties under 2.2 is first allocated to the partners' capital accounts to reflect the results of liquidation.

"(a) . . . [payment of expenses and debts].

"(b) To the limited partners . . .

"(c) To the limited partners . . .

"(d) To the general partners . . .

"(e) To the general partners . . .

"(f) To the general partners . . .

"*Upon the dissolution of the partnership,* a statement shall be prepared by the certified public accountant employed by the partnership setting forth the assets and the liabilities of the partnership, and a copy of such statement shall be furnished to each partner within 45 days *after dissolution.*" (emphasis supplied)

It seems plain from that language, at least reasonably arguable, that a general partner (or his estate) has no right of distribution except upon dissolution (which has not yet occurred) under the principle that, absent contrary indication, the mention of specific matter impliedly excludes others not mentioned (expressio unius est exclusio alterius). In this view, dissolution of the partnership upon Mr. Custer's death is essential to his or his estate's entitlement to the value of his share. Although section 8.2 speaks only of payment to the partner without mentioning death or the estate of a deceased partner, paragraph 9.9 of the contract makes all its terms binding upon heirs and personal representatives, that is, upon a deceased partner's estate.

*Limited Partnership Statutes*

The Uniform Limited Partnership Act of 1975, 59 Pa.C.S. §541(a), provides for "distribution of assets" to creditors and partners in the following language:

"(1) In settling accounts *after dissolution* the liabilities of the partnership shall be entitled to payment in the following order:

"(a) . . . [creditors];

"(b) . . . [limited partners];

"(c) . . . [limited partners];

"(d) . . . [general partners];

"(e) . . . [general partners];

"(f) . . . [general partners];

The Limited Partnership Act of 1917, 59 P.S. §221 contains the same provision. There is no other provision in those statutes for payment to the estate of a deceased partner of the value of his share.

## *Uniform Partnership Act*[4]

There are four provisions of this act, 59 Pa.C.S. §§362 through 365, which bear upon settling a part-

4. Section 311(b) of the Uniform Partnership Act (1975), 59 Pa.C.S. provides in relevant part that its provisions governing general partnerships " . . . shall apply to limited partnerships except insofar as the statutes relating to such partnerships are inconsistent herewith." See also 59 Pa.C.S. §523 which provides that a general partner in a limited partnership " . . . shall have all the rights and powers, and be subject to all the restrictions and liabilities, of a partner in a partnership without limited partners, . . . " with seven listed specific exceptions, number seven of which states that a general partner in a limited partnership has no authority to: "Continue the business with partnership property on the death, retirement, or insanity of a general partner, unless the right to do so is given in the certificate." Here, the certificate grants the option to the remaining general partner to continue "the business" on death of a general partner which, in light of the contractual and statutory provisions respecting dissolution discussed in this opinion, arguably includes the right to do so "with partnership property."

ner's accounts upon dissolution and/or continuation of the partnership business, some of which are cited by plaintiff as establishing her right of recovery, as follows:

Section 362 ("Rules for distribution") provides for "settling accounts between the partners *after dissolution . . .* " (emphasis supplied); since under our reasoning there is arguably no dissolution here, the section is inapposite.

Section 363 ("Liability of persons continuing the business") provides for payment to partners upon continuation of the business after death or retirement of a partner in a number of specific situations, subsections (a) through (j), none of which is applicable here.

Section 364 ("Rights of retiring partner or estate of deceased partner when business continued"), cited and relied on by plaintiff, provides in relevant part as follows:

. "§364. *Rights of retiring partner or estate of deceased partner when business is continued* —

"When any partner retires or dies, and the business is continued under any of the conditions set forth in section 360(b)(2) (relating to dissolution in contravention of agreement) or section 363(a), (b), (c), (e) and (f) (relating to reliability of persons continuing the business), without any settlement of accounts as between him or his estate and the person or parnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option, or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; . . . " (emphasis supplied)

This section is inapplicable instantly because: (a) sections 360(b)(2) and 363 referred to are irrelevant, (b) section 364 provides for payment only by a "dissolved partnership," and (c) section 364 provides for payment only "unless otherwise agreed." The cases cited by plaintiff as applying section 364 in favor of payment to the deceased partner's estate, namely: *Spivak v. Bronstein,* 367 Pa. 70, 79 A.2d 205 (1951); *Conway Estate,* 366 Pa. 641, 79 A.2d 208 (1951) and *Underdown v. Underdown,* 279 Pa. 482, 124 Atl. 59 (1924), are inapposite. To begin, none of them is an arbitration case passing on arbitrability; a decision in such cases favoring payment of the deceased partner's estate on the merits does not necessarily preclude reasonable arguability of a contrary result under the contract. Moreover, those cases differ factually in material respects from the instant case: in *Spivak,* the partnership contract contained no provision governing dissolution in case of death and contained no provision for continuance of the business; *Conway* does not involve arbitration or a partnership and appears to be miscited. In *Underdown,* the partnership contract provided that death of the partner "should not dissolve the partnership, which should be continued by the survivor to the end of the current year"; the court applied the provisions of section 364 because the contract did not otherwise provide and the effect of the contractual provision for continuation of the business only until the end of the year of death merely postponed dissolution until then, analogous to the postponement in this case until the year 2027, there being no other time limitation here on continuing the business. Our case arguably comes within the principle of *Underdown* as stated in C.J.S., Partnership §294 at 800, n. 31 that: "Where the partnership articles provide for continuation for

a specified time only after the death of a co-partner, such death works a dissolution at the expiration of such period." See also *Wisocki v. Howell,* 37 D.&C. 3d 666, 670 (1965) holding that the provisions of section 364 are applicable because: "The agreement here provides nothing as to dissolution or any procedure for winding up the partnership."

Section 365, also cited by plaintiff, reads:

"§365. *Accrual of right to account* —

"The right to an account of his interest shall accrue to any partner, or his legal representative, as against the winding up partners or the surviving partners or the person or partnership continuing the business, at the date of dissolution, in the absence of any agreement to the contrary." December 19, 1975, P.L. 524, §1.

Since arguably no dissolution has occurred here by reason of the provisions of the partnership contract and certificate, section 365 is inapplicable.

(4) The defense contention that postponement of payment of plaintiff's partnership share value until dissolution in the year 2027 and holding decedent's estate open for administration until then, is not a ground for denying arbitration if postponement until then arguably was agreed to by decedent; moreover, the reasonableness of such a postponement is arguably supported by the nature of the business, that is, investment in real estate with borrowed funds over the long term. Compare footnote 4 at page 235, *supra.*

It is apparent that plaintiff's right to the payment claimed arguably hangs on whether a dissolution occurred on death which in turn depends on interpretation of the contract. Whether the foregoing reasonably arguable interpretation of the partnership contract will or should prevail in the judgment of arbitrators remains to be seen.

We have reached our conclusion of arbitrability without giving attention to the public policy arguments of the parties; but as often occurs, public policy preferences lie at the heart of legal choices and of devising principles and procedures for giving expression to those preferences. A common device used in accomplishing such preferences is the presumption (conclusive or rebuttable) favoring the desired policies, or placing or increasing the burden of proof on the parties seeking a solution against policy. For example, our society prefers freedom in the use and alienation of private property over restrictions and forfeitures, so the courts refuse to recognize or to enlarge restrictions and forfeitures by implication only and resolve every doubt and ambiguity against them. See *Metzner v. Soles,* 28 Somerset Leg. J. 261, 266 et seq. (1973); quoting *Jones v. Park Lane,* 384 Pa. 268, 120 A.2d 535 (1956); *Wahl and Jones v. M.F. Land Co. Inc.,* 30 Somerset Leg. J. 291, 299-300 (1975), "Such restrictions 'are contrued with the utmost jealousy, and very easy modes have always been countenanced for defeating them.' "; *B, C & H Corp. v. Acme Markets Inc.,* 39 Somerset Leg. J. 163, 171-3 (1980); *Maust v. Frye,* 39 Somerset Leg. J. 190, 196-7 (1981). Where justice or strong public policy favors a particular claim, the courts will search for a rationale to support it. " 'If a principle in law or equity can be found to sustain [it] . . . , it ought to be applied.' " *Craig Estate,* 35 Somerset Leg. J. 259, 281 (1978), quoting from *Harris Appeal,* 323 Pa. 124, 186 Atl. 92 (1936).

A cornerstone of plaintiff's objection to arbitration is her assertion that contracts for arbitration are disfavored as against public policy, that arbitrability

is not to be found by implication, and that such proscribed implication is essential to arbitrability here of the claim of a deceased general partner's estate to payment of his share at death, because the contract "is silent as to the rights of the estate of a deceased general partner . . . " Plaintiff's policy-implication argument is grounded on language in *Hassler v. Columbia Gas Transmission Corp., supra* whose opinion states, quoting from *Emmaus Municipal Authority v. Eltz,* 416 Pa. 123, 125, 204 A.2d 926, 927 (1964) as follows:

"In making this determination [of arbitrability] we are governed by two basic propositions: (1) that arbitration agreements are to be strictly construed and that such agreements should not be extended by implication, and (2) that when the parties agree to arbitration in a clear and unmistakable manner, then every reasonable effort will be made to favor such agreements." (citations omitted)

But in our view this policy-implication-clear-unmistakable argument is inapplicable here and does not impair our conclusion that contractual arbitration of the instant dispute is at least reasonably arguable.

First, despite our respect for the opinion writer, Judge Spaeth, in *Hassler,* we cannot agree that Pennsylvania law, either now or in 1983 when *Hassler* was written, mandates a strict construction of arbitration contracts, although that rule did represent the judicial attitude in the not too distant past, because such contracts operated to "deprive" the courts of and to "oust" them from jurisdiction. See P.L.E., Arbitration § 7. Hence, the courts would enforce contracts for arbitration only if such agreement was crystal clear. But with developing congestion in the courts from increased litigation, they soon recognized the value of arbitration as a diver-

sionary device which relieved congestion; and instead of giving arbitration contracts a strict construction and treating them as against public policy, they now favor them and give them a liberal construction. The switch is well documented in the Supreme Court in *Ambridge Borough Water Authority, supra,* where the court said:

"Fundamental in our law of contracts is the axiom that parties may write their own contracts, and that it is the function of the courts to interpret those contracts and to enforce them as made. It is *now* recognized in this commonwealth that the enforcement of agreements by the parties to submit future disputes, that may arise under their agreement, to a tribunal other than the courts is not against public policy and is consistent with the concept of the courts' role in dealing with the contractual relationships of individuals. 'Settlements of disputes by arbitration are *no longer* deemed contrary to public policy. In fact, our statutes encourage arbitration and with our dockets crowded and in some jurisdictions congested arbitration is favored by the courts. . . .' " (emphasis supplied)

Accord: *Chester County School Authority v. Aberthaw Construction Co.,* 460 Pa. 343, 333 A.2d 758 (1975), headnote 6 of which states: "Arbitration agreements are to be given a liberal construction." Accord: P.L.E., Arbitration §8. "Arbitration of disputes is generally favored under the statutory and decisional law of this commonwealth." *Cohen v. Temple University,* 299 Pa. Super. 124, 445 A.2d 179 (1982). As stated in *Neshaminy Federation of Teachers v. Neshaminy School District,* 59 Pa. Commw. 63, 66-7, 428 A.2d 1023, 1025 (1981): "This holding is totally compatible with the premise that judges should not be hostile to arbitration as an invader of the exclusive jurisdiction of the courts."

We see this as present law notwithstanding that some cases still repeat the strict construction idea, compare *Cumberland-Perry v. Bogar et al.,* 261 Pa. Super. 350, 396 A.2d 433 (1978).

Whether a contractual provision is to be given a strict or liberal construction, or is disfavored or favored on policy grounds, affects the burden a proponent of a particular interpretation has in order to persuade the court to adopt it. Thus, in strict construction where arbitration is disfavored, the scale of persuasion is already somewhat tipped against arbitration, and the proponent must persuade the court that the contract clearly provides for arbitration of the issue; thus in *Hassler* it is said that it is essential that " . . . the parties agree to arbitration in a clear and unmistakable manner . . . " But in liberal construction where policy favors arbitration, the scales are already tipped toward arbitration and the party opposing it must clearly establish the contrary. For this reason the modern statement of the burden is:

"To be consistent with the general policy favoring arbitration of contractual differences, we believe an order enjoining arbitration of a particular grievance should not be granted unless it may be said with positive assurance that the clause involved is not susceptible to an interpretation that covers the asserted dispute." *Lincoln University v. Lincoln University Chapter, supra.*

This is a materially different approach prescribed by the Supreme Court than that stated in *Hassler* and is the one to be followed here.

Second, we think plaintiff misapplies *Hassler's* prohibition upon construction by implication. It should be noted that the language of *Hassler* couples the prohibition directly with the mandate for strict construction, because the former is a concomitant of and is derived from the latter; so, given

liberal construction a prohibition against implication loses force. Moreover, the language of the prohibition itself does not warrant plaintiff's insistence on precise, explicit, specific and express contractual reference to the particular issue before the court, a virtual absolute abolition of any implication in construing contractual language. *Hassler* does not ban the reasoning process of implication; it says that the contracts should not be *extended* by implication, that is, should not be extended beyond their unambiguous meaning without proscribing inferential interpretation of the meaning of language in synonymous but unused words. It is one thing to infer contractual intention from surrounding circumstances, quite another to translate contractual language into synonymous words which have not been used in the contract. The former might be *extension* by implication, but the latter is simply definition in alternative words according to accepted meanings of the words used. The very purpose of definition is to communicate meaning by use of alternative (synonymous) words or phrases. Compare *Frank v. Zoning Board of Conemaugh Township,* 47 Somerset Leg. J. 30, 36-7 (1988). "What's in a name? That which we call a rose by any other name would smell as sweet."[5]

To appreciate this distinction, we need only look at the facts and holding of *Hassler* itself. There the contract provided for arbitration for "damages which may arise to *crops or fences* from the maintaining, operating, or removal of said [pipe] line . . . " (emphasis supplied) At issue was the arbitrability of damages to *cows* and *trees,* neither of which was specif-

---

5. Shakespeare, *Romeo and Juliet,* Act II, scene ii. Compare Alice (in Wonderland) and Humpty Dumpty on the meanings of words. *Baer Estate,* 41 Somerset Leg. J. 171, 179 (1982).

ically mentioned in the contract. The court held that: (i) the word "arising" is broad enough to include consequential damages from maintaining the right of way such as loss of the cow, (ii) but "by no stretch of language can we conclude that a cow is either a crop or a fence . . . an unwarranted extension of the right of way agreement," (iii) but, although the court on the same principle of strict construction could have been expected to say that a tree is not a crop within the ordinary meaning of language, concluded instead that trees were a crop and that arbitration of damage to trees was proper as being embraced within the word "crops," a definitional implication on the basis of the following reasoning:

"As regards the award for the loss of the trees, however, we find no error. For we believe that to construe 'crops' as embracing 'trees' represents a 'reasonable effort . . . to favor' the parties' agreement to arbitrate. *Capecci v. Capecci, supra.* It is true that 'crop' ordinarily means 'all products of the soil that are grown and raised annully and gathered during a single season,' Black's Law Dictionary, 'Crop' at 448-9 (rev. 4th ed. 1968). But it also means, '[i]n a broader sense, any product of the soil.' *Id.* Here we know from the allegations in appellant's petition to vacate the arbitration award and appellees' answer to the petition that whether the trees damages by the spraying, and subsequently removed, were 'crops' was an issue tried to the arbitrators."

Thus, in *Hassler,* a "tree" is a "crop."

In deciding (ii) *supra* that arbitration is limited to damages to "crops or fences," the *Hassler* court also by implication applies the principle used in interpreting writings, both statutory and contractual, of expressio unius est exclusio alterius, that is, the mention of specific matter implies the exclusion of others not mentioned. C.J.S., Contracts §312. "The

maxim is one of long-standing application, and it is essentially an application of common sense and logic." *Commonwealth v. Charles, supra.* It should be noted, however, that expressio unius is restrictive in its effect, whereas inclusion of "trees" as "crops" seems to be an extension of the contract by implication. It seems that the holdings of *Hassler* are consistent with our view of the process of determining arbitrability, notwithstanding that some of its language seems contrary.

As stated earlier, the maxim of expressio unius is arguably applicable to paragraph 8.2 of the partnership contract which provides for liquidation and distribution to partners "upon dissolution," so that distribution for other causes (except of course a further agreement) such as death of a general partner is impliedly excluded, leaving only the question of defining dissolution — a question of contractual interpretation for the arbitrators. Compare *Margolies v. Zimmerman,* 341 Pa. 493, 19 A.2d 737 (1941); *Wolf v. Baltimore, supra.* In this light, the contract is not silent on either the right of a deceased partner's estate to receive payment of his share at death, nor on the procedure to be followed in that event; instead the contract arguably covers the subject in the instant controversy when interpreted in light of its paragraphs 1.2 ("Commencement and Term of Partnership"), and 8.1 ("Causes of Dissolution" and continuation of the partnership).

Finally, "dissolution" of a partnership in the context of continuation of "the partnership" following death of a partner is essentially a legal concept of well-established meaning absent other language indicating some other meaning; although definition in synonymous terms can be helpful in achieving precision, "dissolution" in such context is not really an ambiguity. "Ambiguity is the effect of words that have

either no definite sense, or else a double one ... " *Ellmaker v. Ellmaker,* 4 Watts 89 (1835). Legal terms used in a contract are given their legal meanings unless the context indicates otherwise. *Fischer & Porter Company v. Porter,* 364 Pa. 495, 72 A.2d 98 (1950); P.L.E., Contracts §147; C.J.S., Contracts §302(1).

From the foregoing it seems clear that the rights of the estate of the general partner may well be covered by the contract, even though not specifically mentioned therein in so many words, depending on how its provisions are interpreted — a matter for the arbitrators. See *Kawlik v. Bosacco, supra.* See also, *Duquesne School District v. Duquesne Education Association,* 475 Pa. 79, 380 A.2d 353 (1977).

## CONCLUSION

We hold that the dispute in issue is a dispute under the partnership contract, and is arbitrable. This conclusion, being based solely on the arguable reasonableness of the contractual interpretation which would cover the instant dispute, does not attempt to evaluate either the arguability or the merits of plaintiff's contrary contentions, except to say that those contentions do not exclude reasonable arguability of the contrary. Accordingly, we shall stay further proceedings in this action until arbitration can be had in accordance with the contract. See *Kramer v. Madston,* 38 Somerset Leg. J. 316, 322 (1978).

## ORDER

Now, March 8, 1989, defendant's motion for arbitration of the claim here involved is granted, hence all other proceedings in this action are stayed until further order. The motion for judgment on the pleadings is denied.