451 A.2d 744

**CHELTENHAM FEDERAL SAVINGS AND LOAN ASSOCIATION**

v.

**POCONO SKY ENTERPRISES, INC.**

**Appeal of John W. DEAN and Katherine Dean, His Wife, and Donald B. McCoy and Joan McCoy, His Wife.**

Superior Court of Pennsylvania.

Argued Dec. 1, 1980.

Filed Oct. 8, 1982.

472

H. Robert Fiebach, Philadelphia, for appellants.

John T. Stieh, Milford, for appellee.

Before HESTER, CAVANAUGH and VAN der VOORT, JJ.

VAN der VOORT, Judge:

This is an appeal from the lower court's determination of a fair market value on a Motion for Deficiency Judgment, pursuant to 42 Pa.C.S. § 8103 et seq., which is substantially a reenactment of 12 P.S. § 2621.1 et seq.

Cheltenham Federal Savings and Loan Association (hereafter referred to as Cheltenham) loaned Pocono Sky Enterprises, Inc. (hereafter referred to as Pocono) $250,000 and as security for the loan received for a mortgage on 66 non-contiguous lots in a real estate development of over 600 lots located in Pike County. Pocono subsequently transferred 55 of those lots to the appellants. The loan went into default and Cheltenham filed a complaint in Confession of Judgment, and judgment was entered against Pocono.[1] A sheriff's sale was eventually held, at which Cheltenham bid in the realty. Cheltenham thereafter filed a petition designated "Petition to File Deficiency Judgment", requesting the court to determine the fair market value. After a hearing, the court entered the following order, from which the appellants have appealed:

## ORDER

AND NOW, March 3, 1980, the fair market value of the subject real estate is fixed as of the date of execution sale, July 25, 1979, at $136,000.00.

Appellant's brief raises five issues, enumerated below.[2]

[1.] The Deans and McCoys had acquired the stock of Pocono prior to the transfer. Prior to the Confession of Judgment, appellants had executed a collateral bond and mortgage pursuant to a loan modification agreement with Cheltenham.

[2.] I. IN ARRIVING AT THE FAIR MARKET VALUE OF THE SUBJECT PROPERTY, THE TRIAL COURT ERRED IN MAKING A DEDUCTION FROM THE RETAIL VALUE OF THE PROPERTY, OR ESTIMATED GROSS SALE PROCEEDS, TO ALLOW FOR PROFIT.

Essentially they raise two fundamental issues specifically; first that the opinion of Cheltenham's expert on values, whose opinion Judge Thomson followed in determining fair market value, was improperly arrived at; and second, that the lower court's determination was contrary to the weight of the evidence.

■ The initial duty and authority to determine "fair market value" under petitions of this kind lies with the fact-finder, the lower court. Our review is limited to deciding whether there is sufficient evidence to sustain the holding of the lower court, or whether there is a reversible error of law. *Shrawder v. Quiggle,* 256 Pa.Superior Ct. 303, 311, 389 A.2d 1135 (1978). Recognizing our limited authority on appeal, and our deference in most cases to the lower court's determination, based upon its first-hand observation of the witnesses, we are nevertheless of the opinion that the lower court's finding and order are not consistent with the weight of the evidence.

The pertinent testimony presented to Judge Thomson can be summarized as follows: On July 19, 1973, Cheltenham loaned $250,000 to Pocono, secured by a mortgage on some 66 lots in a development known as "Sky View Lake". On May 14, 1973, before making this loan, Cheltenham had the

II. IN ARRIVING AT THE FAIR MARKET VALUE OF THE SUBJECT PROPERTY, THE TRIAL COURT ERRED IN MAKING ANY DEDUCTIONS FROM THE RETAIL VALUE OF THE PROPERTY, OR ESTIMATED GROSS SALE PROCEEDS, IGNORING EVIDENCE OF RECENT SALES AND THE HAMMEKE APPRAISALS.

III. IN ARRIVING AT THE FAIR MARKET VALUE OF THE SUBJECT PROPERTY, THE TRIAL COURT ERRED IN MAKING DEDUCTIONS FROM THE RETAIL VALUE OF THE PROPERTY, OR ESTIMATED GROSS SALE PROCEEDS, TO ALLOW FOR THE COSTS OF OBTAINING A "WILLING" BUYER.

IV. IN ARRIVING AT THE FAIR MARKET VALUE OF THE SUBJECT PROPERTY, THE TRIAL COURT ERRED IN MAKING DEDUCTIONS FROM THE RETAIL VALUE OF THE PROPERTY, OR ESTIMATED GROSS PROCEEDS, TO ACCOUNT FOR THE TIME NEEDED TO SELL THE LOTS.

V. EVEN ASSUMING THAT DEDUCTIONS FOR SALES, MARKETING, PROMOTIONAL AND ADMINISTRATIVE EXPENSES WERE PROPER, THE TRIAL COURT'S ACTUAL DEDUCTIONS WERE EXCESSIVE.

properties appraised by William A. Hammeke, who valued the lots at $420,000. (Defendant's Exhibit 1).[3] By deed dated June 25, 1975, Pocono conveyed the 55 lots here involved to John W. Dean III and Donald B. McCoy.

On September 8, 1976, Hammeke made a second appraisal of the 55 lots for Cheltenham, and evaluated them at $400,-000. (Defendant's Exhibit 2). By a bond dated February 4, 1977, Dean and McCoy, with their respective wives, undertook to pay Pocono's then debt of $195,000. On May 4, 1978, Cheltenham took judgment by confession against Pocono in the amount of $215,231.44. Hammeke made a new appraisal dated June 27, 1978 of the 55 lots for Cheltenham, and appraised them at $400,000. On July 25, 1979, Cheltenham bought the property on an execution sale. "As of July 25, 1979"[4] (N.T. 13), William R. Henkelman appraised the 55 lots for Cheltenham. Using what he termed "a subdivision analysis" (N.T., p. 20) to determine what "an investor-developer would pay" (N.T., p. 15), and after making various assumptions discussed hereinafter, Henkelman evaluated the 55 lots at $136,000. As of July 27, 1979 (R. 30a) Joseph Von Hake, at the request of Cheltenham, using a method of "comparable sales", evaluated the 55 lots to be worth $110,-000.

George Fry, President of Cheltenham, testified that Cheltenham's policy was to make loans up to 75 to 80 percent of the "appraised market value" (N.T., p. 69). On or about December 18, 1979, at the request of appellant's attorneys, Davis R. Chant, a real estate appraiser, evaluated the 55 lots as of July 25, 1979, at $255,000.[5] The total debt owing to

3. Hammeke's report states that there are "60 lots in B section" which he valued at $7,000 per lot.

4. Henkelman's report indicates that he had appraised the property for Cheltenham on December 30, 1978 (Plaintiff's Exhibit 1, p. 1), but his evaluation as of that date is not stated.

5. Chant used an "income approach" somewhat similar to Henkelman's; he agreed with Henkelman generally as to a cumulative "retail" or "gross value" of the lots of $428,000 (Henkelman's comparable figure was $426,000), but disagreed as to the estimated expenses of reselling and other allowances.

Cheltenham as of July 25, 1979, including interest and costs, was $226,257.

It seems obvious from the record that Judge Thomson accepted as the best evaluation of the property the opinion of the witness Henkelman, since the court's finding of a value of $136,000 was identical with the net "fair market value" to which Henkelman testified. We find that Henkelman's evaluation was predicated upon two false assumptions:

(1) that the 55 lots could be resold by Cheltenham only at "wholesale" prices to a buyer in bulk; and

(2) that the "gross", or "retail" value of the 55 lots must be reduced to a "net" or "wholesale" value by allowing to Cheltenham, after estimated expenses, a "profit" of 20% of the gross sales price, plus an allowance of 14% per annum for the use of Cheltenham's money—sometimes referred to as a reduction of profit to "present value" with a factor of 14%.

Henkelman, and all witnesses who testified on the point, conceded that the various lots were not all contiguous, and that all had been developed to a point where some of them, at least, could be (and, in fact, some were) sold to individuals for residences at "retail" prices of $6,000 to $7,000 per lot. That Henkelman gave no weight at all to the possibility that Cheltenham could sell some lots at "retail" obviously tends to affect adversely the value of his testimony. Further, it seems to us that there is an additional error in Henkelman's approach from a "gross" or "retail" evaluation to a "net" or "wholesale" value: After deducting estimated expenses from the "gross" sales price, which is, of course, proper, although the various experts differ as to what those percentages should be, Henkelman deducts, first, a "profit" of 20% of the gross sales price and then, second, an allowance at 14% per annum to reduce what Henkelman terms the "fair market value" (a net 40% of the "gross" sales price) to its "present worth".

Henkelman estimated the gross sales price for the 55 lots, sold over a period of four years, at $452,420 and estimated expenses (promotion, commissions, administration and overhead) at 40%, or $180,968. The net of $271,452 can be termed a "gross profit", and could be argued to represent "fair market value", before whatever further adjustments are necessary, including, from a third party investor's viewpoint certainly, an allowance for "profit", or, from the mortgagee's viewpoint, an allowance to reduce the "gross profit" to "present worth", since payment of the mortgagor's debt will be delayed over a period of 4 years. Henkelman reduced the "gross profit" by 20% of the gross sales price ($90,484) to reduce the "fair market value", net, to $180,968, receivable in parts over a four year span, and reduced further by the 14% factor to $136,000, as it happens a further reduction of $44,968.[6]

There is manifest error in this case in giving Cheltenham the benefit in the expert's calculations of *both* a "profit" of

---

**6.** This figure was arrived at through the following calculations using estimated figures.

| First year's | gross sales | $170,400 |
|---|---|---|
| | less 60% | 102,240 |
| | net profit | 68,160 |
| reduced to | present worth (n.profit X .877193) | 59,789 |
| | reduction for present worth | 8,371 |
| Second year: | gross sales | 89,460 |
| | less 60% | 53,676 |
| | net profit | 35,784 |
| reduced to present worth (n.profit X .769468) | | 27,534 |
| | reduction for present worth | 8,250 |
| Third year: | gross sales | 93,933 |
| | less 60% | 56,359 |
| | net profit | 37,574 |
| reduced to present worth (n.profit X .674971) | | 25,361 |
| | reduction for present worth | 12,213 |
| Fourth year: | gross sales | 98,627 |
| | less 60% | 59,176 |
| | net profit | 39,451 |
| reduced to present worth (n.profit X .592080) | | 23,358 |
| | reduction for present worth | 16,093 |

Total present worth or fair market value: $136,042 rounded to $136,000.

20% of the estimated retail sales price *and* an allowance at 14% to reduce the apparent yield from the estimated resales over the 4 year span to its "present worth".

■ Although the Deficiency Judgment Acts of 1941 and 1976 do not say so specifically, their obvious objective is to relieve a debtor of further personal liability to the creditor, if the real property taken by the creditor on an execution has a "fair market value", as of the date of the execution sale, sufficient so that the creditor may dispose of the property to others (or even, sometimes, use it himself) without a net loss to the creditor. See *Phillip Green & Son, Inc. v. Kimwyd, Inc.,* 410 Pa. 202, 205, 189 A.2d 231 (1963). In this specific case, that objective would be accomplished if Cheltenham, having taken title to the real property on July 25, 1979, could dispose of it at a price which would net to Cheltenham $226,257.16, or more, after deducting from the sales price:

a) All of its expenses in making the sale, as well as can be determined, plus, at the most,

b) An allowance to the creditor for the use of its money (the $226,257.16) until the sale (or sales) was completed.[7]

Judge Thomson's determination of "fair market value", as that phrase is applicable to this present case, must be reexamined on a basis consistent with all the pertinent circumstances in this case, which include (but not to the exclusion of other circumstances):

The specific nature of these lots, and the possibility of sale of some or all to buyers in bulk, or to individuals; [8]

**7.** Appellant argues that this allowance should not exceed 9% per annum since the pertinent mortgage provided for interest at 9%. This is a fair argument, but its weight and efficacy is to be determined by the fact-finder.

**8.** These 55 lots present a rather special marketing problem for a buyer in bulk, since they are not all contiguous, and are a part of an aggregate of about 600 lots. Most of the 600 are owned by another interest. The experts seem to agree that the parcel of only 55 lots is too small to interest a marketing team. This complicates the problem.

The allowance of deductions against estimated sales prices necessary expenses to dispose of the property; and

The allowance of some factor for the delay probable before the property is disposed of, but not an additional allowance for a "profit" on the conversion of the property.

■■■ Parenthetically, it should be noted that the Deficiency Judgment Statutes (42 Pa.C.S. § 8103 et seq. and 12 P.S. § 2621.1 et seq.) do not define the phrase "fair market value". Many cases refer to the fair market value" as the price a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell. *Philadelphia and Reading Coal and Iron Company v. Northumberland County,* 323 Pa. 185, 188, 186 A.2d 105 (1936); *Appeal of Pennsylvania Co. for Insurance on Live and Granting Annuities,* 282 Pa. 69, 74, 127 A. 441 (1925). In cases of the present kind, the actual situation is that of a "purchaser" obliged to buy in, in order to protect the loan it made, and an "owner" obliged to sell his property at a sheriff's sale, because he is unable to pay his debt. Remembering that the Deficiency Judgment Statutes were enacted to relieve the judgment debtor and are to be construed liberally in his favor, *Shrawder v. Quiggle,* supra, the determination of "fair market value" in this present case should be made on the basis of what reasonably the judgment creditor can get out of the property in partial or complete recapture of the loan and interest on the loan, after necessary expenses, as suggested above, but without giving the judgment creditor an additional "profit"

The gross selling price, as determined from the judgment creditor's viewpoint, seems obviously a higher value than would be offered by an "investor-developer" who is not obliged to take over the property. Such buyer will be induced to buy the property only if his purchase price plus his expected costs will still permit him an attractive profit to compensate him for his know-how, expertise, risk of loss, and the use of his money. Fundamently, Henkelman's testimony as to value, apparently adopted by the lower court, is an expression of his opinion of what a speculative investor

would pay for the property, rather than an expression of the "fair market value" as between Cheltenham and appellants, neither of whom is acting willingly or speculatively. Both are trying to get out of an unfortunate situation on the best basis possible.

■ We repeat that the initial duty and authority to determine "fair market value" in this case lies with the lower court and that our authority on review is limited. Nevertheless, the determination of a fair market value of $136,000 seems inconsistent with much of the testimony, particularly the evidence as to the three appraisals made for Cheltenham by Hammeke, all made in the ordinary course of business, in the neighborhood of $400,000, upon which evaluations Cheltenham obviously relied in making and handling the loan in this case.

The order appealed from is vacated and the case is remanded for further proceedings for a re-determination of fair market value on a basis consistent with this opinion.

We do not retain jurisdiction.

CAVANAUGH, J., dissented and would affirm on the basis of the opinion of the court below.