**CONFEDERATION LIFE INSURANCE COMPANY, Appellee,**

v.

**MORRISVILLE PROPERTIES, L.P. and Site Development, Inc., Appellant.**

Superior Court of Pennsylvania.

Argued March 19, 1998.
Filed July 9, 1998.

Joseph H. Blum, Philadelphia, for appellants.

Frank N. Gallagher, Doylestown, for appellee.

Before CAVANAUGH, HUDOCK and HESTER, JJ.

CAVANAUGH, Judge:

Confederation Life Insurance Company ("Confederation Life"), a judgment creditor, purchased real property belonging to Morrisville Properties, L.P. ("Morrisville"), at an execution sale. Confederation Life filed a petition to fix the property's fair market value for determining its right to a deficiency judgment. Morrisville and Site Development, Inc. ("SDI") filed a cross-petition to have the judgment marked satisfied based on Confederation Life's delay in petitioning to establish its right to a deficiency judgment. The Court of Common Pleas of Bucks County denied Morrisville and SDI's petition and

fixed the property's value at $2,600,000. Morrisville and SDI now appeal.[1]

The relevant facts underlying this action are accurately and adequately set forth by the trial court as follows:

On April 15, 1988, defendant, Morrisville Properties, borrowed $2,700,000 from plaintiff, Confederation Life Insurance Company (Confederation Life). In return, defendant executed a mortgage note to plaintiff for that amount. The note was secured by a mortgage on the property known as Morrisville Square Shopping Center. Defendant Site Development Inc. (SDI) [2] agreed to act as guarantor and surety for defendant Morrisville Properties, up to a maximum of $675,000. As evidence of that agreement, on April 15, 1988, SDI executed a limited surety agreement.

In December of 1991, defendant Morrisville Properties defaulted under the mortgage note by failing to make its regular monthly payments. It also failed to pay county and township real estate taxes due. Plaintiff, Confederation Life, elected to accelerate the entire unpaid principal balance of the Note, as well as a prepayment premium. On February 10, 1992, plaintiff filed the instant lawsuit, seeking $2,905,958.50, plus costs and interest from defendant Morrisville Properties and $642,930.33 from SDI. On March 20, 1992, defendants Morrisville Properties and SDI filed a joint Answer and Counterclaim alleging plaintiff's imprudent management practices as mortgagee-in-possession, breach of fiduciary duty and breach of duty of good faith.

On November 21, 1994, a nonjury trial was held before the Honorable Edward G. Biester, Jr. He ruled in favor of the plaintiff and against defendant Morrisville Properties in the sum of $3,290,049.08. He also ruled in favor of the plaintiff and against defendant SDI in the sum of $642,-

930.33. On defendants' counterclaim, he ruled in favor of plaintiff.

Thereafter, on December 9, 1994, plaintiff filed its Praecipe for Judgment against defendant Morrisville Properties in the sum of $3,290,049.08 and defendant SDI in the sum of $642,930.33, and judgment was entered by the prothonotary.

On January 17, 1995, plaintiff filed its praecipe for a writ of execution for mortgage foreclosure on real estate.

On April 13, 1995, plaintiff purchased the shopping center at the sheriff's sale for $1,100,000. On September 25, 1995, the Sheriff delivered the sheriff's deed to the Recorder of Deeds. On December 1, 1995, plaintiff filed its Petition to Fix Fair Value. On the same date, defendants filed their Petition to Satisfy Judgment. By Order of September 23, 1996, after oral argument on the same date, [the trial] Court denied defendants' Petition to Satisfy Judgment and granted Plaintiff's Petition to Fix Fair Value of Real Estate. On July 3, 1997, [the trial court] held a hearing to fix the fair market value of the real estate. By Decree of July 17, 1997, [the trial] Court fixed the fair market value at $2,600,000. Defendants now appeal both [the] September 23, 1996 Order and [the] July 17, 1997 Decree.

Trial Court Opinion at 1–3 (additional footnote omitted).[3]

Appellants raise the following issues for our review:

1. Did the lower Court commit an error of law in its interpretation of the Deficiency Judgment Act when it denied SDI's and Morrisville's Petition to Satisfy Deficiency Judgment?

2. Did the lower Court commit an error of law by not releasing defendant SDI from further obligation to Confederation

---

1. Under the terms of the note, Morrisville has no personal liability for the debt. Therefore, Morrisville is only a nominal party herein.

2. SDI is the sole general partner of Morrisville Properties, a Pennsylvania limited partnership.

3. The Honorable Edward G. Biester, Jr. presided at the original hearing on November 21, 1994. However, we note that the Honorable Daniel J. Lawler presided at the hearing to fix the fair market value of the real estate, and as such, the trial court opinion in this matter was authored by Judge Lawler.

when the Court interpreted the language of the Limited Surety Agreement?

3. Did the lower Court abuse its discretion when it set the shopping center's fair market value by neglecting to consider the required factors for valuation, and by relying on incompetent evidence?

Appellants' Brief at 22.[4]

▮▮ Appellants' first contention is that the trial court committed an error of law in its interpretation of the Deficiency Judgment Act (the "Act") when it denied SDI's and Morrisville's Petition to Satisfy Deficiency Judgment. Appellants argue that, because the fair market value of the property ($2,600,000) exceeded the amount of SDI's guaranty ($675,000), the Act precludes any further recovery from SDI. To support this argument, defendants rely on the case of *Federal Home Loan Mortgage Corp. v. Arrott Associates, Ltd.,* 60 F.3d 1037 (3d Cir. 1995).

▮▮ Initially, we note that defendants are correct in asserting that if we were to follow the holding in *Arrott,* SDI would be discharged in this matter. However, as this court has previously stated, we are not bound by decisions of federal courts inferior to the United States Supreme Court. *Dorn v. Stanhope Steel, Inc.* 368 Pa.Super. 557, 574–576, 534 A.2d 798, 807 (1987). After thorough review of *Arrott,* we have concluded that the court misconstrued 42 Pa.C.S. § 8103(c) and we adopt a different interpretation of the governing statute.

*Arrott* was factually similar to the case at bar. In *Arrott,* the lender had obtained a mortgage foreclosure judgment against a limited partnership for $2,494,991 and a personal judgment against the general partners for $223,288. Like the case *sub judice,* the loan was largely non-recourse. After the foreclosure sale, the lender filed a timely petition under the Act to fix the fair market value of the property for deficiency judgment purposes. The district court set the fair market value at $1,000,000 and found that the general partners were personally liable for the deficiency up to the amount of the judgment against them. On appeal, the Third Circuit reversed the district court and held that, because appellants were only partially liable for the debt and because the established fair market value of the property substantially exceeded the amount for which the partners were liable, "the plain language of subsection (c) requires the appellants' release and discharge from the liability under the personal judgment," *Id.* at 1040.

We disagree with the *Arrott* court's interpretation that the Act requires the release of all partial guarantors from their entire liability for a debt whenever their portion of the liability is less than the fair market value of the property. Unlike the Third Circuit, we do not find that the language of the statute to be so clear as to forestall inquiry into the other tenets of statutory construction. In fact, we find the language in the Act to be anything but clear when applied to those factual circumstances in which a party is responsible for only a portion of the total debt. The relevant provision of the Deficiency Judgment Act reads in pertinent part as follows:

> After the hearing and the determination by the court of the fair market value of the property sold, the debtor, obligor, guarantor and any other person liable directly or indirectly to the judgment creditor for the payment of the debt shall be released and discharged of such liability to the extent of the fair market value of said property ... and thereupon the judgment creditor may proceed by appropriate proceedings to collect the balance of the debt.

42 Pa.C.S. § 8103(c).

There is no specific mechanism for the application of the Act in a partial personal liability situation. Therefore, in interpreting the Act as it applies to the facts before us, we must look for guidance to the mandates of the Pennsylvania Statutory Construction Act.

The first rule of statutory construction "is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). Our supreme court has stated that the purpose of § 8103 of the Deficiency Judgment Act is to

---

4. We have renumbered appellants' questions for the sake of this appeal.

remedy an inequity resulting to judgment debtors when the judgment creditor bought the debtor's property at a forced sale. Prior to the adoption of the Act, a judgment creditor could purchase, at sheriff's sale, valuable real estate of the debtor for a nominal sum, (i.e. costs and taxes), and yet retain the full amount of his judgment. *Philip Green & Son, Inc. v. Kimwyd, Inc.*, 410 Pa. 202, 205, 189 A.2d 231, 232–233 (1963). The debtor was to be credited only for the actual sum realized at the sale. *Ochiuto v. Prudential Insurance Company of America*, 356 Pa. 382, 52 A.2d 228 (1947). Under the Deficiency Judgment Act, the creditor's judgment is to be reduced by the fair market value of the property bought by the creditor rather than the sale price.... If no petition to fix the fair market value of the property is timely brought by the creditor, the judgment in favor of the creditor is satisfied, released and discharged as a matter of law.

*First National Consumer Discount Co. v. Fetherman*, 515 Pa. 85, 96, 527 A.2d 100, 105 (1987).

While the court in *Arrott* acknowledged that the policy of the Act "is to protect debtors against the risk of a mortgagee obtaining a double recovery by purchasing the property for less than fair market value and pursuing the debtor for the deficiency, thereby recovering more than the debt amount," *Arrott*, 60 F.3d at 1041, it ignored that, in protecting the debtor against double recovery, the Act is not intended to impose a loss on creditors. *Cheltenham Federal Savings & Loan Association v. Pocono Sky Enterprises, Inc.*, 305 Pa.Super. 471, 477–480, 451 A.2d 744, 748 (1982) ("obvious objective [of the Deficiency Judgment Act] is to relieve a debtor of further personal liability to the creditor, if the real property taken by the creditor on an execution has a 'fair market value', as of the date of the execution sale, sufficient so that the creditor may dispose of the property to others ... *without a net loss to the creditor*.") (citation omitted) (emphasis added). This is precisely the result which the *Arrott* decision creates, requiring complete discharge of all debtors whose liability does not exceed the fair market value,

even when the creditor has suffered a substantial loss.

In *Arrott*, there was no apparent potential for double recovery. The property's fair market value was set at $1,000,000 and the general partners' liability was $223,288.33. Therefore, their sum ($1,223,288.33) was substantially less than the foreclosure judgment of $2,494,991.51. Similarly, in the case *sub judice*, when the property's fair market value of $2,600,000 is added to SDI's personal liability of $642,930.33, the sum ($3,242,930.30) is still less than the foreclosure judgment of $3,290,049.08. Thus, in cases like *Arrott* and the one at bar, there is no apparent potential for double recovery and to preclude the creditor from seeking the "remainder of the debt" does nothing to further the purpose of the act, a fact that the *Arrott* court acknowledged. *Id.* at 1041.

Additionally, the Third Circuit's interpretation of § 8103(c) violates another rule of statutory construction by disregarding the last clause of that section, which states that, after the fair market value is fixed and the debtor or other obligor is released from liability to the extent of the fair market value, "the judgment creditor may proceed by appropriate proceedings to collect the balance of the debt." 42 Pa.C.S. § 8103(c). *See* 1 Pa.C.S. § 1921(a) ("[e]very statute shall be construed, if possible, to give effect to all of its provisions"); *see also* 1 Pa.C.S. § 1922(2) ("the General Assembly intends the entire statute to be effective and certain").

If a debtor or other obligor is released whenever their individual debt is less than the fair market value of the property, in many cases the creditor will not be able to collect "the balance of the debt."

Our research has uncovered no cases decided by the courts of this Commonwealth which have opined that a judgment creditor may proceed against a debtor or other person liable to the judgment creditor only if that person's liability is greater than the fair market value of the property. If our General Assembly intended such a result, it easily could have chosen such plain words. Moreover, such an interpretation is contrary to the purposes of the

Deficiency Judgment Act. Thus, the Third Circuit's interpretation of section 8103(c) in *Arrott* which restricts judgment creditors from seeking the "remainder of the debt" owed to them is unsound.

Trial Court Opinion at 10–11.

Finally, the Third Circuit's construction of the Deficiency Judgment Act has the effect of producing an absurd and unreasonable result. *See* 1 Pa.C.S. § 1922(1) (in ascertaining the intention of the General Assembly in the enactment of a statute, it can be presumed that the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable).

The Third Circuit acknowledged that its interpretation of the Deficiency Judgment Act created an anomalous result. *Arrott*, 60 F.3d at 1041. Had the judgment creditor pursued a personal action against the general partners first and then brought the foreclosure action, it would have been able to collect the entire debt. *See* Reed, ***Limited Recourse Guaranties under Pennsylvania's Deficiency Judgment Act***, Pennsylvania Bar Association Quarterly 127, 128 (July 1996). Similarly, if the debtors had been liable for the entire amount of the debt secured by the mortgage, a deficiency judgment could have been entered against them and the judgment creditor would have been made whole. *Arrott*, 60 F.3d at 1041. In contrast, in a situation where the debtor is only liable for a portion of the debt, that debtor's liability is discharged whenever the portion of the debt is less than the fair market value.

We are in complete accord with the trial court's conclusion that

[t]he result in *Arrott* would permit the absurd result of requiring the complete discharge of all debtors whose liability does not exceed the fair market value, even though the creditor has suffered substantial loss. For instance, where multiple debtors are liable for portions of a large debt, the possibility exists that the creditor cannot recover the deficiency between the fair market value and the total debt from any of the debtors because their individual debts do not exceed fair market value of the property. In such a case, the creditor would suffer a substantial loss.

Additionally, whether the creditor was entitled to collect a deficiency would vary, dependent upon whether the creditor or a third party bought the property at sheriff's sale. *Cf. PNC Bank v. Balsamo*, 430 Pa.Super. 360, [378, 6]34 A.2d 645, 654 (1993), *alloc. Denied*, [538 Pa. 659] 648 A.2d 790 (Pa.S.Ct.1994) ( [Deficiency] Judgment Act applies only if property is sold to the judgment creditor).

In the future[,] lenders will be unlikely to accept partial guaranties since such guaranties are rendered nullities under the *Arrott* Court's interpretation of section 8103(c). Based on *Arrott*, savvy lenders in the future will likely require a full guaranty to keep from being placed in the absurd and unreasonable position dictated by *Arrott*. *Limited Recourse Guaranties*, *supra* at 131. We do not believe that our General Assembly intended such absurd and unreasonable results.

Rather, it is our opinion that section 8103(c)'s direction that the debtor, guarantor or other person liable for the debt is released of such liability *"to the extent of the fair market value"* is capable of a reasonable interpretation [Emphasis added.] We believe that the phrase *"to the extent of the fair market value"* simply means that "the creditor's judgment against the debtor is reduced by the fair market value of the property purchased by the creditor rather than by the actual sale price of the property." *Cf. Horbal v. Moxham National Bank*, [548 Pa. 394], 697 A.2d 577 (1997).

Trial Court Opinion at 12–14.

In sharp contrast to the court's interpretation in *Arrott*, the Act's dual purposes of precluding double recovery but allowing the judgment creditor to recover the balance of the debt without a net loss are met by allowing a judgment creditor to pursue a person who is partially liable for the debt and by releasing and discharging that person of his liability only to the extent that the entire debt exceeds the fair market value of the property. Accordingly, we decline to construe section 8103(c) in such a manner as to require the unreasonable and absurd result

of releasing partial guarantors from their entire liability for a debt whenever their portion of liability is less than the fair market value of the property when the judgment creditor has not been made whole for the "entire balance of the debt" and there is no apparent potential for the judgment creditor obtaining a double recovery.

■ Appellants' second contention is that the trial court erred by not releasing SDI from further obligation to Confederation Life according to the terms of the Limited Surety Agreement. Appellants' argument is that pursuant to the terms of the Limited Surety Agreement, its liability ended when the fair market value of the property was set in excess of $675,000. We disagree. The Limited Surety Agreement stated that it was "an agreement of suretyship as well as a guaranty...." Upon any default of the mortgage by Morrisville, the Limited Surety Agreement specifically provided that Confederation Life may do any of the following:

(a) proceed directly against the Guarantor without first proceeding against the Borrower for an amount not exceeding $675,-000.00, but any amount Lender may recover from Guarantor shall be credited against any amounts then owed by Borrower on account of principal; or (b) proceed against the Borrower in an action to foreclose the Mortgage, in which event Guarantor shall be liable for any deficiency Lender may suffer (as defined in the applicable Pennsylvania Deficiency Judgment Act), but not more than $675,000.00; or (c) proceed against the Borrower and Guarantor simultaneously; provided, however, if and when the Borrower and Guarantor have paid Lender a total of $675,000.00 in reduction of principal, Lender shall release Guarantor (as distinguished from the Borrower) from such proceedings and from any further liability under this Agreement.

Upon Morrisville's default, Confederation Life chose to proceed via option (b) and foreclosed on the mortgage, holding SDI, as guarantor, liable for any deficiency up to $675,000.

SDI makes a contrary argument based upon the wording of the Agreement. It relies upon the language:

if and when the Borrower and/or Guarantor have paid Lender a total of $675,000.00 in reduction of principal, Lender shall release Guarantor (as distinguished from the Borrower) from such proceedings....

SDI's contention is that the receipt of the property as a result of the Sheriff's sale is equivalent to a payment by Borrower or Guarantor. We cannot find that this is so in the context of the Agreement. According to the terms of the Agreement, it is clear that what was intended was that the monthly payments due from the Borrower under the mortgage would be credited against the Guarantor's obligation. In fact, the Agreement specifically states that "[a]s Borrower makes regular monthly payments of principal on the Loan, the obligations of Guarantor shall be reduced...." This is because, while payments were being made, the Lender still had the security of the real estate. In the present situation, Confederation has already received the property and found it to be insufficient to satisfy the debt. Therefore, SDI remains liable.

■ Finally, SDI argues that the trial court erred in setting the fair market value of the property in question by neglecting to consider the required factors for valuation and by relying on incompetent evidence. At the hearing to set the fair market value of this property, each party presented an expert witness. Confederation Life's expert valued the property between $2,450,000 and 2,900,000, with a value conclusion of $2,600,-000. SDI's expert valued the property between $3,100,000 and $3,215,000, with a value conclusion of $3,200,000. The trial court accepted Confederation Life's expert's figure and fixed the value of the property at $2,600,-000.

In the instant case, the property at issue is the Morrisville Square Shopping Center. It is located at 330 West Trenton Avenue, Falls and Lower Makefield Townships, in Bucks County, Pennsylvania. It was built in 1987. It consists of over eight acres of land. On the land is a shopping center, as well as a free standing Burger King Restaurant. It includes thirteen stores, two of which were vacant at the time of the sheriff's sale. Its leasable area is 31,230

square feet. The most appropriate use of the property is its present use, as a retail commercial center.

Trial Court Opinion at 15 (citations to the record omitted).

Appellant argues that the trial court committed reversible error when it set the property's fair market value at a figure contrary to the weight of the evidence in that the trial court (1) ignored overwhelming evidence regarding the sale of comparable property that showed the shopping center in question was worth at least $3,100,000; (2) relied on a fundamentally flawed income capitalization analysis by Confederation Life's expert witness in determining the property's fair market value; and (3) failed to consider the economic conditions of the area or other important factors when it valued the property.

 "Fair market value" is the price which "a purchaser, who is willing but not obligated to buy, would pay an owner, who is willing but not obligated to sell." *Bryn Mawr Trust Co. v. Healy*, 446 Pa.Super. 501, 508, 667 A.2d 719, 723 (1995) (citing *First Pa. Bank, N.A. v. Peace Valley Lakeside*, 329 Pa.Super. 218, 478 A.2d 42 (1984)). In arriving at a fair market value, courts should consider recent sales of realty of comparable location and description, uses to which the realty is adapted and might reasonably be applied, demand for the realty, and income produced by it, and all elements which might affect its actual value. *Union National Bank of Pittsburgh v. Crump*, 349 Pa. 339, 37 A.2d 733 (1944). "In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict winner, the appellees in the present case. Our sole task is to decide if there was sufficient evidence to sustain the verdict." *Fetzer v. Vishneski*, 399 Pa.Super. 218, 221, 582 A.2d 23, 25 (1990) (citing *Fannin v. Cratty*, 331 Pa.Super. 326, 480 A.2d 1056 (1984)). Additionally, "[t]he trier of fact weighs the credibility of an expert witness's testimony regarding valuation. *Mellon Bank v. Restaurant of A.B.E.*, 364 Pa.Super. 567, 528 A.2d 654 (1987). An appellate court must accept the credibility determinations of the trial court with respect to the credibility of

witnesses. *Id." Bryn Mawr Trust Co.*, 446 Pa.Super. at 508, 667 A.2d at 723.

After careful review of the evidence, we find that there was sufficient evidence to sustain the verdict. Nor is the verdict against the weight of the evidence. The trial court found the sales comparison approach not to be particularly helpful, although the comparable properties relied upon by appellee were found to be more similar to the property in question than appellants' comparables. We agree.

Appellant's expert appraiser considered three sales of purportedly comparable real estate. However, the first, which sold for $6,345,000 in September of 1993 contained an anchor store (Frank's Nursery & Crafts Store). The Morrisville Square Shopping Center has no anchor store. Additionally, the first comparison property had the Drug Emporium as a major tenant, had more acreage than the Morrisville Square Shopping Center, and building space twice as large as the Morrisville Square Shopping Center.

The second sale was for $1,675,000 on January 14, 1994. This property was only one-fourth the amount of land and half the square footage of the subject property and CVS leased 55% of the total square feet. Additionally, unlike the subject property, the second comparison was 100% occupied.

The third sale was for $5,200,000 in September of 1996. Although the land area was less, the building space was much larger than the Morrisville Square Shopping Center and the property had two major tenants, Petco and Giant Carpet.

Appellee also relied upon the shopping center which sold for $1,675,000. In addition, appellee relied upon three other sales. The first shopping center sold for $900,000 on March 23, 1995. The second sale was for $1,300,000 on February 22, 1995. Although these properties were much smaller than the Morrisville Square Shopping Center, their rental rates were similar.

Appellee's third comparable property sold on December 14, 1994 for $1,025,000. Although its land area was substantially smaller, its building size approximated that of the subject shopping center. Additionally

"[a]lthough this property was sold at a sheriff's sale in June of 1994 for nominal consideration, there was no evidence to indicate that the subsequent sale in December of 1994 was for less than fair market value." Trial Court Opinion at 20.

With regard to the income capitalization approach, the trial court found that appellee's appraisal was based on more reliable information and found appellee's expert to be more credible.

First, [appellants'] expert calculated the income stream of the property based on a rental rate of $10.50 per square foot, while [appellee's] expert used a rate of $10 per square foot. The $10 rate was based on what the shopping center's manager was asking for rental. [Appellants'] expert testified that he was not aware of that fact.

Second, [appellants'] expert used a discount or yield rate of 11%, which was developed using corporate Baa bonds as a basic rate. However, he testified that the corporate Baa bond rate of 8.75% was a typographical error and that using the correct bond rate of 8.25%, his yield rate would have been 12%, the same as [appellee's].

Third, [appellants'] expert's estimate of market value of $3.2 million was based on what an investor would pay for the property based on a seven year period, as opposed to a ten year period used by [appellee] in calculating market value.

Appellee's former real estate marketing manager, William Evans, testified that the property was offered for sale at $3,200,000. He credibly testified that he determined the offering price by using the capitalization rate, i.e. that the net income after expenses would be approximately $320,000 or ten per cent. After two months on the market, the real estate broker's feedback was negative and the broker requested a price reduction. Therefore, within the first thirty days after the property was listed for sale, [appellee] reduced the price to $2,900,000. Thereafter, [appellee] had four offers between $1.9 million and $2.3 million. Evans testified as to three offers from an unrelated person. The original offer was for $1.9 million. It was subse-

quently raised to $2 million. In September of 1996, after almost six months of marketing, the third offer of $2.3 million was accepted. However, because the lease of the Burger King tenant provided for a right of first refusal, [appellee] presented the offer to Burger King. On October 22, 1996, the Burger King Franchise elected to exercise its right of first refusal and purchased the property.

Trial Court Opinion at 21–22 (citations to the record omitted).

In attacking appellee's valuation using the income capitalization approach, appellants first assert that appellee's expert witness incorrectly arrived at an inflated income capitalization valuation by utilizing surveys which erroneously assumed that an institutional investor—an investor interested in higher grade properties which are larger and have anchor tenants—would be the buyer for the property. However, both appraisals were based on the same two surveys – the Cushman and Wakefield survey and the Korpacz survey. Additionally, appellee's expert specifically testified that he had discounted the figures in the surveys to account for the fact that the surveys were based on institutional investors, whom he acknowledged would not be interested in such a property.

Next, appellants assert that the actual sale price ($2,300,000) was not reliable because appellee was a distressed or motivated seller. This, in effect, means that because appellee was in a financial crisis, appellee would sell the property for a discounted price at the first available opportunity. However, the evidence produced at the trial was that property had been on the market for over six months before the offer was made and accepted. While appellants' expert testified that

"the estimated length of time the subject property would have been offered on the market prior to a hypothetical sale at market value on the effective date of the appraisal" – would be "approximately 9 to 12 months[, . . . appellants] presented no evidence to indicate that a higher offer was likely to have been forthcoming had the property been marketed for three to six more months.

Trial Court Opinion at 22–23. Furthermore, appellants' expert witness, when questioned on cross-examination, could not rebut appellee's assertions that appellee was not under any time limit to sell the property. Therefore, there is no basis for concluding that the sale price of $2,300,00 was not an accurate reflection of the value of the property.

Finally, we reject appellants' bald assertion that the trial court failed to consider the local economic conditions and population growth in fixing the fair market value of the subject property. We note that these are but two factors in the overall analysis of ascertaining the fair market value of the property. Review of the record shows that the trial court was thorough and deliberate in deciding this issue. Further, as we find the evidence to be sufficient to support the trial court's determination of the fair market value, appellants' claim of error is without merit. *Bryn Mawr Trust Co.*, 446 Pa.Super. at 507–509, 667 A.2d at 723.

Accordingly, the order and the decree are affirmed.